MEDICARE GLASER
CORPORATION, Appellee,

v.

GUARDIAN PHOTO, INC., Appellant.

No. 90–1728.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 10, 1991.

Decided June 27, 1991.

Charles A. Seigel, III, St. Louis, Mo., for appellant. Jason M. Rugo, St. Louis, Mo., appeared on appellant's brief.

Richard E. Greenberg, Clayton, Mo., for appellee. Adam E. Miller appeared on appellee's brief.

Before MAGILL, Circuit Judge, ROSS, Senior Circuit Judge, and HUNTER,* Senior District Judge.

ROSS, Senior Circuit Judge.

Medicare–Glaser Corporation (Medicare) was in the business of operating retail pharmacies and drug stores, which offered photofinishing services, among other products and services. Guardian Photo, Inc. (Guardian) was in the business of providing

* The HONORABLE ELMO B. HUNTER, Senior United States District Judge for the Western District of Missouri, sitting by designation.

photofinishing services for retail businesses such as Medicare. Guardian now appeals from a ruling by the district court[1] finding that it had breached its contract with Medicare for the provision of photofinishing services. We affirm.

## I.

In May of 1985, Guardian and Medicare entered into a contractual relationship in which Guardian agreed to provide Medicare with photofinishing services for at least two years and Medicare agreed to pay for the services pursuant to a pricing schedule issued by Guardian. In particular, the agreement provided that Guardian would pay Medicare $100,000 for the first year and $125,000 for the second year of the parties' relationship (hereinafter called the "supplemental allowance"), plus a 6% advertising accrual payment, which would be based on 6% of the total wholesale price Medicare paid Guardian for Guardian's services. The agreement stated in full:

> Guardian Photo agrees to furnish Medicare–Glaser Corporation with an advertising allowance of $100,000.00 during the first year of business payable by check in monthly payments of $8,350.00 each. The second year Guardian Photo will furnish $125,000.00 for advertising. This money will be in addition to a 6% advertising accrual payable quarterly by check.
>
> If Medicare–Glaser Corporation would like, Guardian Photo could advance up to $50,000.00 immediately and the remaining balance for the first year would be paid in monthly amounts of $8,350.00 each.

Based on the plain language of the agreement, Guardian contracted to pay Medicare $100,000 for the first year and $125,000 for the second year without condition. Guardian now contends, however, that this supplemental allowance was conditioned upon Medicare doing one million dollars in annual photofinishing sales. Be-

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

cause Medicare never reached that level of sales during the contractual relationship, Guardian contends that it is not liable for the payment of the supplemental allowance.

As provided in the agreement, Guardian paid Medicare $50,000 in June of 1985 and also paid the 6% quarterly advertising accrual. According to the agreement, the remaining $50,000 for the first year was payable in six monthly installments of $8,350 each beginning in December 1985. The first $8,350 installment, however, was never made. Instead, during a meeting in February 1986, Guardian informed Medicare that it was suspending payment of the supplemental allowance because Medicare's volume of photofinishing sales was lower than it had expected. Guardian contends that at the February 1986 meeting, the suspension of the supplemental allowance was fully discussed and it was agreed that no further payment would be made until such time as Medicare's annual sales volume met or exceeded the sum of $800,000, at which time further payment of the supplemental allowance would be negotiated.

Also at the February meeting, Guardian agreed to pay the 6% advertising accrual on a monthly basis instead of a quarterly basis as initially agreed to in May 1985. Apparently, this change was made in order to insure that Medicare had a monthly revenue of advertising money even after the $8,350 monthly payments were suspended. It is undisputed that at no time during this February meeting did Medicare make any statements indicating that it was waiving or releasing its rights to the supplemental allowance.

From mid-February 1986 to about May 2, 1986, the parties continued to perform in accordance with their respective understandings of the original contractual relationship, with the exception of the suspension of the supplemental allowance. Medicare alleges that it continued to make repeated oral requests for the supplemental allowance during this time. Then, in a letter dated May 2, 1986, Guardian informed Medicare that it would increase the advertising accrual percentage from 6% to 13% with a corresponding increase of 7% for the services provided by Guardian. In other words, Guardian would charge Medicare 7% more for its photofinishing services, and at the same time reimburse Medicare an extra 7% for its advertising allowance. It is undisputed that this arrangement did not benefit either party, but merely provided the appearance of an increase in the advertising allowance. Medicare stated that it understood this to be a "stop-gap measure" until the outstanding supplemental allowance was paid. This arrangement continued until the parties' relationship ended in May 1988.

In July 1986, another meeting was held with Guardian and Ray Jeans, Medicare's representative. At that meeting, the advertising accrual was increased from 13% to 15%. No statement was made indicating that this increase was in lieu of payment of the advertising allowance or that Medicare was waiving its right to the supplemental allowance.

In May 1988, Ray Jeans' superiors at Medicare learned that Guardian had not paid the supplemental allowance. Mr. Jeans was immediately demoted and transferred and Medicare terminated its relationship with Guardian. The balance of the supplemental allowance amounting to $175,000 was never paid. The parties stipulated that at the time their relationship ended, Medicare owed Guardian $59,460 for photofinishing services. That amount remains unpaid.

Medicare filed this action against Guardian for breach of contract and fraud and sought to collect $175,000 for the unpaid supplemental allowance. Guardian then counterclaimed for the outstanding account balance and for fraud, claiming that Medicare misrepresented its sales volume in the course of Guardian's solicitation of Medicare for its photofinishing business.

After a two day trial and before findings of fact and conclusions of law were issued, District Judge George F. Gunn recused himself from the case due to a conflict of interest. The case was then reassigned to Judge Hungate. After a chambers conference was conducted on November 21, 1989, Judge Hungate entered an order providing that the court would determine the necessi-

ty for a new trial after reviewing the parties' proposed findings of fact and conclusions of law and the trial transcript. Three months later the court issued its ruling finding that no issues of credibility required a retrial and that the trial transcript could be treated as supporting affidavits for summary judgment.

On March 29, 1990, Judge Hungate granted judgment in favor of Medicare on its breach of contract claim. The district court found that there was no evidence to support Guardian's defenses for failure to pay the supplemental allowance. 739 F.Supp. 469. The court also rejected Guardian's claim that the agreement was modified to relieve Guardian of its obligations to pay the allowance and similarly rejected any defense of waiver or estoppel. Finally, the court rejected both parties' fraud claims. Guardian now appeals the district court's decision. Following a careful review of the briefs, record and arguments of the parties, we affirm the judgment of the district court.

## II.

As its first point of error, Guardian asserts that the district court erred as a matter of law by entering judgment without a retrial. The rule has been established that when a judge has yet to make findings of fact and conclusions of law, the successor judge must retry the case unless all parties consent to resolution based upon the trial transcript or unless summary judgment would be appropriate. *Emerson Elec. Co. v. General Elec. Co.*, 846 F.2d 1324, 1326 (11th Cir.1988). Guardian argues that reversal is required because the district court failed to explicitly state that "there exists no genuine issue of material fact," and because Guardian presented several disputes as to material facts which required another trial prior to entry of judgment.

Here, the district court ruled that "upon a review of the record, ... no credibility determinations are required." The court concluded that it would treat "the trial transcript as akin to supporting affidavits for summary judgment." The court's ruling sufficiently concludes that the case was appropriately treated as a motion for summary judgment.

Guardian also argues that disputed issues of material fact exist which preclude a summary judgment ruling. First, it asserts that a factual question exists as to whether the supplemental allowance was to be paid only if sales reached a one million dollar level. Second, Guardian maintains that there is a disputed issue of fact as to whether the parties' original agreement was subsequently modified. While these issues will be considered on their merits fully, *infra*, we note here that there is no dispute as to the fundamental or underlying facts; rather, the dispute is solely with the conclusions to be drawn from that evidence and their legal significance. We conclude that, even given the benefit of every reasonable inference, Guardian has failed to present any genuine issues of material fact. We note that the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## III.

As to the merits of Guardian's claims, Guardian first contends that the court erred by finding that there was no consideration to support a modification of the agreement. Specifically, Guardian contends that in February 1986, the parties modified their original agreement whereby Medicare waived its right to receive the supplemental allowance which was due in part at that time. In exchange, Guardian purportedly agreed to increase the frequency of the payment of the 6% advertising accrual allowance from quarterly to monthly. Guardian also asserts that as consideration for modification of the agreement, it gave up its right to terminate the relationship with Medicare and sue for a refund of the $50,000 supplemental allowance it had previously paid.

It is well established that an agreement to modify a contract must itself possess all the elements necessary to form a

contract, including the element of consideration. "Such consideration is not present when one party merely agrees to do that which it was already legally liable to do for a greater consideration, nor is it present when one party agrees to do less than it is already obligated to do for the same or greater consideration." *Twin River Constr. Co. v. Public Water Dist. No. 6,* 653 S.W.2d 682, 690 (Mo.App.1983).

██ We find that no consideration existed in the February 1986 attempt to modify the contract. Guardian was already legally liable for the 6% advertising accrual payment; Guardian simply agreed to make this same payment on a monthly rather than quarterly basis. Similarly, no consideration is evidenced by Guardian's May 1986 agreement to increase the 6% advertising accrual payment to 13% since this increase was entirely offset by the 7% increase in charges to Medicare. In both cases, Guardian merely agreed to do that which it was already obligated to do, while Medicare received less than what it had contracted for under the original agreement.

Guardian's argument that its July 1986 decision to increase the advertising accrual payment from 13% to 15% constituted consideration for the contract modification is similarly without merit. A Guardian representative testified that this increase occurred only as a result of Medicare agreeing to discontinue photofinishing services at its smaller, less productive stores.

The district court found that during the course of the parties' relationship, Medicare never expressly stated that it was releasing its right to the supplemental allowance due under the parties' original agreement. We find that as a matter of law, no evidence was adduced by Guardian to controvert this finding. At least three witnesses, including Guardian's own representative, testified that Medicare continued to request payment after the February modification meeting. Furthermore, Guardian's representatives testified that even after the February agreement, Guardian attempted to placate Medicare's demand for payment of the funds through alternative arrangements in May of 1986, when Guardian informed Medicare that it would increase its advertising allowance from 6% to 13%, with a corresponding increase in photofinishing charges by 7%. As the district court noted, had the agreement actually been modified in February, none of the actions taken to ameliorate the effects of the nonpayment would have been necessary. There is nothing in the record that would indicate that consideration existed for the modification of the agreement.

## IV.

██ Guardian next takes issue with the district court's finding that Guardian breached its contract with Medicare. The district court rejected Guardian's argument that the parties' agreement required payment of the supplemental allowance only when a certain volume of sales was reached. The evidence showed that 1) there was no such requirement in the written agreement; 2) the signatories to the agreement both testified that there was no oral discussion conditioning payment of the supplemental allowance on an established sales volume; 3) it was unnecessary to "modify" the original agreement and "suspend" payments of the supplemental allowance if the allowance was not understood by the parties to be already owed and outstanding regardless of sales volume; and 4) two Guardian representatives who were present when the original agreement was executed admitted that the one million dollar figure was not mentioned at the meeting.

Had the payment of the supplemental allowance been tied to sales volume as Guardian contends, there would have been no need to modify the original agreement or suspend the payments as Guardian stated it would do in February of 1986. Guardian simply could have stated that the money was not due. Guardian's actions, as well as the testimony of various witnesses plus the plain language of the agreement itself, establishes that payment of the supplemental allowance was not based on a particular sales volume. The district court did not err in finding that Guardian had breached its contract with Medicare.

## V.

■ Guardian also argues that the district court erred in rejecting its defenses of estoppel and waiver. According to Guardian, Medicare's failure to rescind the contract during the period between February 1986, when the agreement was purportedly modified, and March 1988, when a demand letter was received by Guardian, constitutes grounds for both estoppel and waiver as a matter of law.

■ Forbearance, however, does not constitute a waiver. *Kroh Bros. Dev. Co. v. State Line Eighty–Nine, Inc.,* 506 S.W.2d 4, 12 (Mo.App.1974). If a waiver is implied from conduct, the conduct must be "so consistent with and indicative of an intention to relinquish [the particular] right ... and so clear and unequivocal that 'no other reasonable explanation of [the] conduct is possible.'" *United Missouri Bank South v. Cole,* 597 S.W.2d 209, 211 (Mo. App.1980) (quoting *Berger v. McBride & Son, Bldrs., Inc.,* 447 S.W.2d 18, 20 (Mo. App.1969)). Similarly, the doctrine of estoppel requires "an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon." *Brown v. State Farm Mut. Auto Ins. Co.,* 776 S.W.2d 384, 386 (Mo.1989) (en banc).

Nothing in the record before us contains evidence of such specific acts to indicate Medicare's intention to relinquish its right to the supplemental allowance. Rather, there was ample evidence that Medicare requested the payments even after the purported contract modification in February. The district court did not err in rejecting Guardian's defenses of waiver and estoppel.

## VI.

■ Finally, Guardian asserts that the district court erred in failing to find that Medicare fraudulently induced Guardian into soliciting Medicare's photofinishing business based upon misrepresentations regarding Medicare's sales volumes. We find no evidence to establish such an allegation. The record indicates that Medicare's Ray Jeans reported to Guardian that Medicare was doing approximately $500,-000 to $700,000 in photofinishing sales in the St. Louis market. Guardian representatives testified that the one million dollar figure was based on the parties' discussions regarding potential sales that might be possible with sufficient effort, or estimates by Guardian's representatives about Medicare's existing St. Louis market plus the available Springfield, Missouri market. It is well established that statements of opinion regarding future events do not constitute actionable misrepresentation, unless offered by one professing to have superior knowledge. *Eureka Pipe, Inc. v. Cretcher–Lynch & Co.,* 754 S.W.2d 897, 898 (Mo. App.1988). Here, Guardian was apprised of the accurate facts; any further figures were properly described as projections which simply do not provide the basis for a fraud claim.

## VII.

Based on the foregoing, the judgment of the district court is affirmed.