262 F.3d 897 (9th Cir. 2001)
 PATELCO CREDIT UNION; PATELCO CREDIT UNION HEALTH PLAN; AMANDA JONES, PLAINTIFFS-APPELLEES,
v.
SUDHIR SAHNI; SAHNI & ASSOCIATES, INC.; SUDHIR SAHNI & ASSOCIATES, DEFENDANTS-APPELLANTS.
PATELCO CREDIT UNION; PATELCO CREDIT UNION HEALTH PLAN; AMANDA JONES, PLAINTIFFS-APPELLEES,
v.
SUDHIR SAHNI; SAHNI & ASSOCIATES, INC.; SUDHIR SAHNI & ASSOCIATES, DEFENDANTS-APPELLANTS,
AND
KERSTETTER & RILLO, APPELLANT.
 No. 99-15716, 99-15718
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 12, 2001
Filed August 27, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Christopher J. Rillo, McKenna & Cuneo, L.L.P., San Francisco, California, for the appellants.
 Michael Hoffman, Littler Mendelson, San Francisco, California, for the appellees.
 Appeal from the United States District Court for the Northern District of California Susan Illston, District Judge, Presiding. D.C. No. CV-91-01028-S.
 Before: Procter Hug, Jr., John T. Noonan, and William A. Fletcher, Circuit Judges.
 
 Hug, Circuit Judge
 OPINION
 I. INTRODUCTION
 
 1
 Plaintiff Patelco Credit Union ("Patelco") and related parties brought this action under the Employee Retirement Income Security Act ("ERISA") for breach of fiduciary duties by Sudhir Sahni and his companies (collectively"Sahni") in administering Patelco's employee health benefit plan. The case was tried to the bench before District Judge Robert H. Schnacke; however, he died before making findings of fact or conclusions of law. The case was reassigned to District Judge Saundra Brown Armstrong, who granted partial summary judgment in favor of Patelco. The case was later reassigned to District Judge Susan Illston, who entered summary judgment in favor of Patelco on the remaining claims.
 
 
 2
 Sahni argues on appeal (1) that due process requires a new trial when a judge dies after a bench trial without making findings of fact; (2) that Federal Rule of Civil Procedure 63 was violated because the successor judges did not certify familiarity with the record; (3) that the plan was not an ERISA plan; (4) that benefits checks from the employer's stop-loss carrier were not ERISA assets; (5) that genuine issues of material fact existed regarding whether Sahni was a fiduciary; (6) that genuine issues of material fact existed regarding whether Sahni breached his fiduciary duties or whether, instead, the money he retained was reasonable compensation that had been disclosed to and approved by Patelco; (7) that evidence and a witness were erroneously excluded; and (8) that sanctions were imposed in violation of Rule 11 and Rule 63 of the Federal Rules of Civil Procedure.
 
 II. FACTUAL BACKGROUND
 
 3
 Plaintiffs in this action are Patelco Credit Union, the Patelco Credit Union Health Plan (the "Plan"), and Amanda Jones, a Vice President of Patelco and a fiduciary of the Plan. Defendants are Sudhir Sahni, an insurance broker, Sahni & Associates, Inc., and Sudhir Sahni & Associates, a sole proprietorship.
 
 
 4
 Patelco established the Plan to provide health and medical benefits for its employees. Prior to 1983 the Plan was fully insured by Travelers, with employees paying a $50 annual deductible. In 1983, upon the advice of Sahni, Patelco decided to partially self-fund the Plan in order to avoid paying rising premiums. Under the new arrangement, the employees would continue to pay a $50 annual deductible, but Patelco would cover any annual excess up to $500, at which point an insurance policy with Jordan Jones & Associates would cover the remainder.
 
 
 5
 Sahni managed the Plan and had control over its assets. For example, he selected Jordan Jones as the insurer of the claims in excess of $500. Each month, Patelco paid to Sahni, at his direction, an amount of money that he estimated would be necessary to cover (1) benefit checks that he would write to medical care providers, (2) insurance premiums for the Jordan Jones policy, and (3) the administrative fee that Sahni alleges Patelco had agreed to pay him. None of these components was itemized. As the employees filed claims for benefits, Sahni either approved or denied them and then wrote checks to medical care providers for those services that were covered. Sahni based his coverage decisions on Patelco's Plan booklet, which he had created by combining Travelers' previous booklet with a vision plan and a dental plan. Each month, Sahni produced and provided to Patelco lists of the under-$500 and over-$500 claims.
 
 
 6
 Sahni's accounting for the assets of the several plans that he administered can only be described as sloppy. He maintained three accounts: one for "premiums" that came in from clients like Patelco; one for paying claims; and one for his own company. However, the money of multiple plans was commingled in the accounts for premiums and claims. As to Patelco, the entire amount received each month pursuant to Sahni's estimate (which included money for premiums, money to pay claims, and his alleged administrative fee) was initially placed in the premiums account. Later, Sahni would transfer money from the premiums account to the claims account to cover the checks that he had written to medical care providers. Sahni had sole control over these accounts; Patelco's employees did not have check-writing authority, nor did they even know the account number or location of the accounts.
 
 
 7
 In 1988, the Plan became fully self-funded. As before, employees paid the first $50 each year, but Patelco now paid everything over that amount. Patelco purchased stop-loss insurance from Standard Insurance Company of Oregon to protect it from catastrophic annual losses exceeding $10,000 per employee or $100,000 for the Plan. Sahni was the one who shopped around for an insurer to replace Jordan Jones and selected Standard Insurance. Patelco terminated Sahni as of March 31, 1990; however, Sahni continued to retain his administrative fees for three more months.
 
 III. PROCEDURAL HISTORY
 
 8
 On April 4, 1991, Patelco filed suit against Sahni in the United States District Court for the Northern District of California. The complaint alleged that Sahni breached his fiduciary duties and engaged in transactions prohibited by ERISA[1] sections 404(a) and 406(b), which are codified at 29 U.S.C. §§ 1104(a) and §§ 1106(b). On March 5, 1992, Patelco filed an amended complaint adding a RICO[2] cause of action.
 
 
 9
 On December 17, 1993 the parties appeared before Judge Armstrong for a pretrial conference and oral arguments on various motions before the court. Judge Armstrong orally denied all of the motions with the exception of Patelco's request for sanctions, which she took under advisement.
 
 
 10
 On January 10, 1994, a bench trial commenced before Judge Schnacke; it concluded January 26, 1994. At the close of the plaintiff's case, on January 18, Judge Schnacke dismissed the RICO cause of action due to insufficiency of the evidence. However, before entering findings of fact or conclusions of law, Judge Schnacke unfortunately died. The case was reassigned to Judge Armstrong and later reassigned to Judge Illston. They entered several orders that are the subject of this appeal and which are discussed in detail below. Final judgment was entered by Judge Illston on March 8, 1999. A notice of appeal was timely filed, and we have jurisdiction pursuant to 28 U.S.C. §§ 1291.
 
 
 11
 A. February 14, 1994 Order Granting Sanctions (Armstrong, J.)
 
 
 12
 In an order dated February 14, 1994, Judge Armstrong set forth in detail the reasons for the oral pretrial rulings that she had made on December 18, 1993. Of relevance to this appeal is her ruling denying Sahni's motion for an order excluding evidence from trial or, in the alternative, compelling discovery and continuing the trial.[3]
 
 
 13
 Sahni's motion was premised on the following facts. In October 1991, Gerald Beaudoin, Sahni's first of four sets of attorneys in this case, served Patelco with a request for production of documents and a notice of deposition of Plaintiff Amanda Jones. Production was to occur at Beaudoin's office at the time of Jones's deposition; however, prior to the scheduled date, Beaudoin withdrew as counsel. Nevertheless, Patelco responded to the request, agreeing to produce certain documents but objecting to the remainder on a variety of grounds, including relevance. This response was served on Sudhir Sahni personally.
 
 
 14
 No further action occurred regarding these discovery requests until Sahni's fourth (and current) counsel, Chris Rillo, took over on December 1, 1993. Rillo came across these requests and sought the documents from Patelco. Patelco offered to produce the documents that it previously agreed to produce, but it refused to produce the documents to which it had previously objected. Dissatisfied, Rillo filed a motion in limine seeking to exclude all the evidence that Patelco had refused to produce. He argued that Patelco could not claim that the documents were irrelevant during discovery and then later admit them at trial. In the alternative, the motion sought to depose Jones, obtain the requested documents, and continue the trial.
 
 
 15
 Judge Armstrong ruled that if Sahni had wished to pursue the discovery, he should have done so "within a reasonable time" via Federal Rule of Civil Procedure 37. She did not consider his motion, "filed on the eve of trial and over two years after service of the discovery requests," to be timely. Instead, she attributed Sahni's failure to obtain the requested documents to lack of diligence. Considering Sahni's motion to be legally and factually frivolous as well as untimely, and noting that Patelco's counsel had explained to Rillo what had happened and warned that it would seek sanctions, Judge Armstrong granted Patelco's request for sanctions.[4] By a later order dated November 21, 1995, Judge Illston awarded sanctions in the amount of $9,306.25.
 
 
 16
 B. March 31, 1995 Order Granting Partial Summary Judgment and Ruling that Sahni's Answer was Not Effectively Amended at Trial (Armstrong, J.)
 
 
 17
 In the fall of 1994, both sides of this lawsuit moved for summary judgment based on the evidence presented at the trial before Judge Schnacke and produced during discovery. On March 31, 1995, Judge Armstrong granted partial summary judgment for Patelco and indicated that evidentiary hearings would be necessary on the remaining claims. Judge Armstrong held that the undisputed facts indicated (1) that the Plan was an ERISA plan; (2) that the stop-loss insurance policy was an "asset of the plan"; (3) that Sahni was a fiduciary; (4) that Sahni breached his fiduciary duties by charging the Plan $71,919.00 more in premiums than he paid to Jordan Jones to insure the Plan; and (5) that Sahni breached his fiduciary duties by depositing into his own account two checks totaling $10,614.08 made payable to Patelco from the Plan's stop-loss insurer, Standard Insurance. Judge Armstrong ordered Sahni to reimburse the above amounts.
 
 
 18
 Judge Armstrong also held that summary judgment was not appropriate as to Patelco's claims regarding administrative fees and insurance commissions. She concluded that genuine issues of material fact existed regarding Sahni's alleged disclosure of administrative fees that he was charging and insurance commissions that he was receiving.
 
 
 19
 Finally, Judge Armstrong ruled that evidence admitted at trial did not effectively amend Sahni's answer to include a statute of limitations defense. She concluded that Patelco's failure to object to evidence that Sahni had disclosed his administrative fees to Patelco in 1983 did not imply consent to try a statute of limitations defense because the evidence was relevant to pleaded issues.[5]
 
 
 20
 C. November 21, 1995 Order Denying Reconsideration and Setting Amount of Sanctions (Illston, J.)
 
 
 21
 Sometime after Judge Armstrong's March 31, 1995 order discussed above, this case was reassigned to the Honorable Susan Illston. Both parties moved for Judge Illston to reconsider Judge Armstrong's March 31 order, and both parties moved regarding Judge Armstrong's February 14, 1994 sanctions order. Judge Illston denied the motions for reconsideration.
 
 
 22
 As to Judge Armstrong's February 14, 1994 order granting Patelco's motion for sanctions, Judge Illston denied Sahni's motion for reconsideration and set the amount of sanctions at $9,306.25. Sahni had argued that the sanctions order failed to comply with Rule 11, as amended in December 1993, because (1) Patelco's motion for sanctions was not made separately, but rather was combined with its opposition to Sahni's motion; and (2) Patelco had not offered Sahni the safe harbor of withdrawing his motion.
 
 
 23
 D. September 21, 1998 Order Granting Summary Judgment as to Remaining Claims (Illston, J.)
 
 
 24
 On September 21, 1998, Judge Illston granted summary judgment on the claims that remained after Judge Armstrong's order of March 31, 1995. The remaining issues were whether Sahni was liable to restore insurance commissions that he had received and administrative fees that he had retained. Judge Illston stated: "Pursuant to Rule 63 of the Federal Rules of Civil Procedure, the Court has determined that no further trial or hearing is necessary . . . and hereby enters the following order based on the record developed in this action." Based on the undisputed fact that Sahni had received insurance commissions from Jordan Jones, Judge Illston concluded that this was a per se breach of fiduciary duty in violation of 29 U.S.C. §§ 1106(b). She concluded as a matter of law that §§ 1106(b) admits of no exceptions; therefore, "disclosure of prohibited transactions will not immunize a defendant from liability." Judge Illston ordered Sahni to restore to the Plan $52,412.04 in undisputed commissions that he had received from Jordan Jones.
 
 
 25
 Next, Judge Illston concluded that, based on the undisputed fact that Sahni had retained administrative fees from Patelco's monthly payments to him, Sahni likewise breached his fiduciary duties as established by §§ 1106(b). Judge Illston restated her conclusion that disclosure could not redeem Sahni's retention of fees.
 
 
 26
 Judge Illston then turned to the question of what amount of fees Sahni must restore to the Plan. Because the parties disputed what evidence Judge Schnacke admitted at trial and what testimony had been given, Judge Illston ordered further briefing, instructing the parties to cite to the exhibits admitted at trial and the testimony of witnesses.
 
 
 27
 E. March 8, 1999 Order Awarding Patelco Administrative Fees and Attorney's Fees (Illston, J.)
 
 
 28
 On March 8, 1999, Judge Illston ordered Sahni to restore $131,307.07[6] in administrative fees to Patelco. Sahni contended that the administrative fees retained by him were only $28,183.70 and that the remainder had been paid out to the employees' medical care providers. Therefore, the only dispute was over the amount of benefits that Sahni had paid. Because Sahni was the breaching fiduciary, Judge Illston placed the burden on him to demonstrate the amount that he had paid on the Plan's behalf. She rejected Sahni's purported accounting because it relied upon checks that Judge Schnacke had excluded as unverifiable. She also declined to consider the declaration of Donald Lowell Bailey, who opined as to the amount of administrative fees that remained unaccounted for, in part because he had relied upon the same excluded checks. Having concluded that Sahni had not carried his burden, Judge Illston ordered Sahni to restore the full amount of unaccounted for funds.
 
 IV. ANALYSIS
 
 29
 A. Proceedings Following the Unavailability of a Judge
 
 
 30
 Sahni contends that, absent consent by both parties, due process requires a new trial when a judge becomes unavailable after conducting a bench trial but before entering findings of fact and conclusions of law. Sahni's per se rule is not compatible with Federal Rule of Civil Procedure 63:
 
 
 31
 If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.
 
 
 32
 Fed. R. Civ. P. 63. When Rule 63 is applicable, its qualifying language assures that due process will not be violated when the successor judge proceeds where the original judge left off rather than ordering a new trial. The real issues in this case are: to what extent did Rule 63 apply, and did the district court comply with the rule?[7]
 
 
 33
 Sahni argues that Rule 63 does apply in this case and that the district court failed to comply with it. It appears, however, that Rule 63 applies only where the successor judge steps into the shoes of the original judge in order to finish something that the original judge had started. The epitome of this would be for "the substitute judge to make a finding of fact at a bench trial based on evidence heard by a different judge." Fed. R. Civ. P. 63 advisory committee's note to 1991 amend. In a less extreme situation, this court held that a successor judge must make a Rule 63 certification before deciding a motion for a new trial following a judgment entered by the original judge after a bench trial. Canseco v. United States, 97 F.3d 1224, 1225 (9th Cir. 1996). And the D.C. Circuit recently held that Rule 63 applied to three post-trial motions: a motion for a new trial, a motion to amend the original judge's findings, and a motion to correct "inadvertent omissions" in the damages calculation. Mergentime Corp. v. Wash. Metro. Area Transit Auth., 166 F.3d 1257, 1263 (D.C. Cir. 1999) ("By refusing to consider the post-trial motions, the successor judge failed to comply with Rule 63. After all, the original judge could not have refused to consider them.").
 
 
 34
 However, as an alternative to stepping into the shoes of the unavailable district judge under Rule 63, "[t]he successor judge may examine the trial transcript as if it were`supporting affidavits' for summary judgment purposes and enter summary judgment if no credibility determinations are required." 12 Moore's Federal Practice §§ 63.05[3] (3d ed. 1999). A significant body of case law supports this proposition. See Bromberg v. Moul, 275 F.2d 574, 576 (2d Cir. 1960); see also Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 95 F.3d 593, 601 (7th Cir. 1996) (suggesting that on remand successor judge could decide the case on the existing record if credibility determinations were unnecessary); Medicare Glaser Corp. v. Guardian Photo, Inc., 936 F.2d 1016, 1019 (8th Cir. 1991) (affirming resolution on summary judgment); Emerson Elec. Co. v. Gen. Elec. Co., 846 F.2d 1324, 1326 (11th Cir. 1988) (citing with approval rule from Bromberg but reversing summary judgment because credibility was at issue); Mesa Petroleum Co. v. Coniglio, 787 F.2d 1484, 1488 (11th Cir. 1986) (affirming resolution on summary judgment); Schoenfield v. Dickman (In re Schoenfield), 608 F.2d 930, 935 (2d Cir. 1979) (citing with approval the rule from Bromberg and affirming grant of new trial because credibility was at issue). Thus, Rule 63 is not violated when no material facts are in dispute and the successor judge rules as a matter of law.
 
 
 35
 The law discussed above indicates that treating the trial record as affidavits in support of summary judgment is appropriate and does not run afoul of Rule 63.[8] Because this is the manner in which Judge Armstrong and Judge Illston proceeded, the issue becomes whether summary judgment was properly granted, an issue we discuss below.
 
 B. Summary Judgment
 
 36
 A grant of summary judgment is reviewed de novo. Balint v. Carson City, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc). The court of appeals "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." Id. We conclude that the district court did correctly apply the relevant substantive law and that there are no genuine issues of material fact.
 
 1. STATUTE OF LIMITATIONS
 
 37
 There is no merit to Sahni's threshold argument that the evidence adduced at trial effectively amended his answer to include a statute of limitations affirmative defense. Although Federal Rule of Civil Procedure 15(b) does provide for amendment "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, " there was no such consent here. Sahni does not contend that Patelco expressly consented to try the statute of limitations issue. And, "[w]hile it is true that a party's failure to object to evidence regarding an unpleaded issue may be evidence of implied consent to a trial of the issue, it must appear that the party understood the evidence was introduced to prove the unpleaded issue." Campbell v. Trustees of Leland Stanford Junior Univ., 817 F.2d 499, 506 (9th Cir. 1987). As we have explained:
 
 
 38
 The rule does not permit amendments to include issues which may be "inferentially suggested by incidental evidence in the record." [collecting cases] An adverse party cannot be expected to object to the introduction of evidence that is only tangentially related to the issues actually pleaded prior to trial unless the party has notice that the evidence is being introduced as proof on some other unpleaded issue.
 
 
 39
 Consolidated Data Terminals v. Applied Digital Data Sys., Inc., 708 F.2d 385, 396 (9th Cir. 1983); see also LaLonde v. Davis, 879 F.2d 665, 667 (9th Cir. 1989).
 
 
 40
 Sahni contends that Patelco's failure to object to evidence concerning alleged disclosures in 1983 constituted implicit consent to try the statute of limitations defense. We disagree. The evidence of Sahni's alleged disclosures was independently relevant to another issue being litigated, namely, Sahni's breach of fiduciary duties. The introduction of evidence that directly addresses a pleaded issue does not put the opposing party on notice that an unpleaded issue is being raised. Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 814 (9th Cir. 1994) ("Where evidence alleged to have shown implied consent was also relevant to the other issues at trial, it cannot be used to imply consent to try the unpleaded issue.") (quotations and brackets omitted). Therefore, Patelco cannot have been expected to object to the evidence, and its failure to do so does not signal its implicit consent to add the statute of limitations issue. Compare Galindo v. Stoody Co., 793 F.2d 1502, 1513 (9th Cir. 1986) (holding that numerous, direct references during trial raised issue). The district court did not err in rejecting this argument made by Sahni in his motion for summary judgment.
 
 2. ERISA PLAN
 
 41
 An ERISA "employee welfare benefit plan" is (1) a plan, fund or program, (2) established or maintained by an employer through the purchase of insurance or otherwise, (3) for the purpose of providing medical, surgical, or hospital care or benefits (4) to its participants or their beneficiaries. 29 U.S.C. §§§§ 1002(1), (3); Qualls v. Blue Cross of Cal., Inc., 22 F.3d 839, 843 (9th Cir. 1994); Kanne v. Conn. Gen. Life Ins. Co., 867 F.2d 489, 491-92 (9th Cir. 1988).
 
 
 42
 Sahni admitted in his answer that the Plan is an employee welfare benefit plan. Now, however, he contends that because the Jordan Jones policy (which insured the over-$500 claims until Patelco self-funded those claims itself) was part of a multi-employer welfare arrangement, Patelco's Plan is not an employee welfare benefit plan. He relies upon MDPhysicians & Assocs. v. State Bd. of Ins., 957 F.2d 178, 186 (5th Cir. 1992), a case holding that a particular multi-employer welfare arrangement was not itself an ERISA employee welfare benefit plan.
 
 
 43
 However, whether a multi-employer welfare arrangement itself is an employee welfare benefit plan is a separate question from whether an employer subscribing to a multiemployer welfare arrangement has established an ERISA employee welfare benefit plan vis-a-vis its own employees. See id. at 182 n.4, 184-86; Credit Managers Ass'n of S. Cal. v. Kennesaw Life & Accident Ins. Co., 809 F.2d 617, 625 (9th Cir. 1987). The question is whether Patelco's Plan is an ERISA employee welfare benefit plan, not whether Jordan Jones's multi-employer welfare arrangement is one. Crull v. Gem Ins. Co., 58 F.3d 1386, 1389 (9th Cir. 1995). Here, the undisputed facts show that Patelco established the Plan to provide medical benefits to its employees, paying in one form or another all of the costs except an annual $50 deductible. Thus, the Plan is an ERISA employee welfare benefit plan. Id. at 1390.
 
 3. ERISA ASSETS
 
 44
 Sahni contends that the two checks for stop-loss benefits from Standard Insurance made payable to Patelco are not ERISA assets and, therefore, cannot be the basis of ERISA fiduciary liability under 29 U.S.C. §§ 1106(b). Sahni argues that the stop-loss policy was meant to protect Patelco, not its employees, and cites Department of Labor Advisory Opinion 92-02A, 1992 WL 15175, for support. The opinion letter concludes that a stop-loss policy is not a plan asset when purchased by an employer who has a self-funded plan that pays claims from its general assets. However, this authority is not binding:
 
 
 45
 An advisory opinion is an opinion of the Department [of Labor] as to the application of one or more sections of [ERISA], regulations promulgated under [ERISA], interpretive bulletins, or exemptions. The opinion assumes that all material facts and representations set forth in the request are accurate, and applies only to the situation described therein. Only the parties described in the request for opinion may rely on the opinion, and they may rely on the opinion only to the extent that the request fully and accurately contains all the material facts and representations necessary to issuance of the opinion and the situation conforms to the situation described in the request for opinion.
 
 
 46
 ERISA Procedure 76-1, §§ 10, 41 Fed. Reg. 36281 (Aug. 27, 1976) (emphasis added).
 
 
 47
 Moreover, Sahni's characterization of the stop-loss policy as being for the protection of Patelco rather than the employees is inaccurate and conflicts with statements made by this court. We have instructed that plan "assets" as used in 29 U.S.C. §§ 1106(b) should be construed broadly in order to effectuate Congress's "overriding concern with the protection of plan participants and beneficiaries." Acosta v. Pac. Enters., 950 F.2d 611, 620 (9th Cir. 1991). Patelco's Plan covers all claims above the employees' $50 deductible, so the stop-loss policy protects the employees by ensuring that benefits will be available even in the case of catastrophic losses. Cf. 29 C.F.R. §§ 2580.412-4 ("The term `funds or other property' is intended to encompass all property which is used or may be used as a source for the payment of benefits to plan participants . . . . It does include all items in the nature of quick assets, such as cash, checks and other negotiable instruments . . . .")
 
 
 48
 Furthermore, "[t]o determine whether a particular item constitutes an `asset of the plan,' it is necessary to determine whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries." Acosta, 950 F.2d at 620; Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1467-68 (9th Cir. 1995). The Standard Insurance stop-loss benefit checks could certainly be used to the benefit of Sahni. He received the checks directly from Standard Insurance and exercised exclusive control over the accounts in which the Plan's funds were kept. Accordingly, the undisputed facts indicate that the checks are "assets of the plan."
 
 4. FIDUCIARY STATUS
 ERISA defines "fiduciary":
 
 49
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 50
 29 U.S.C. §§ 1002(21)(A) (emphasis added). The undisputed evidence of Sahni's control over Plan assets is more than sufficient to establish that he was a fiduciary. Dispositive in the instant case is this court's explanation:
 
 
 51
 [29 U.S.C. §§ 1102(21)(A)] treats control over the cash differently from control over administration. The statutory qualification, that control must be"discretionary" for it to establish fiduciary status, applies to the first and third phrases, management and administration but not to the second, assets. "Any" control over disposition of plan money makes the person who has the control a fiduciary.
 
 
 52
 IT Corp. v. Gen. Am. Life Ins. Co., 107 F.3d 1415, 1421 (9th Cir. 1997); see also Yeseta v. Baima, 837 F.2d 380, 386 (9th Cir. 1988) ("[A] fiduciary includes a person who `exercises any authority or control respecting management or disposition of [a plan's] assets.' ") (second brackets in original).
 
 
 53
 It is undisputed that Sahni determined the amount of the monthly payments that Patelco paid, which were deposited into an account under his sole control. Then, at his own initiative and not at the direction of Patelco, Sahni transferred some of these funds to a different account from which he wrote checks to pay claims. Furthermore, Sahni alleges that he was entitled to keep, as his administrative fee, a portion of Patelco's monthly payments, so he necessarily exercised dominion over this portion of Patelco's funds as well. Finally, Sahni received and deposited stop-loss benefits checks issued by Standard Insurance that were made payable to Patelco. Sahni's significant, and in most respects exclusive, control over the Plan's assets makes him a fiduciary. See IT Corp., 107 F.3d at 1421 ("The right to write checks on plan funds is `authority or control respecting management or disposition of its assets.' ").
 
 5. BREACH OF FIDUCIARY DUTIES
 
 54
 Sahni was required to discharge his duties with respect to the Plan "solely in the interest of the participants and beneficiaries" for the "exclusive purpose of providing benefits" to them and "defraying reasonable expenses of administering the plan." 29 U.S.C. §§ 1104(a)(1)(A).[9] In addition, Sahni was prohibited from self-dealing:
 
 
 55
 A fiduciary with respect to a plan shall not
 
 
 56
 (1) deal with the assets of the plan in his own interest or for his own account, . . . or
 
 
 57
 (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.
 
 
 58
 29 U.S.C. §§ 1106(b).[10] Pursuant to 29 U.S.C. §§ 1109(a),[11] Patelco sought to have Sahni "make good to such plan any losses . . . and to restore to such plan any profits."
 
 
 59
 Sahni counters that 29 U.S.C. §§ 1108(c)[12] provides that the self-dealing prohibition of §§ 1106(b) does not prohibit him from "receiving any reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred, in the performance of his duties with the plan." Therefore, Sahni argues that summary judgment was inappropriate because genuine issues of material fact existed regarding his disclosure of his compensation and the reasonableness of the amount. Specifically, Sahni contends (1) that he disclosed his administrative fees in a 1983 meeting and follow-up letter; (2) that he made similar oral disclosures in 1989; and (3) that, in any event, the funds he received or retained during the time he handled the Plan were reasonable. Sahni argues that not allowing him to receive reasonable compensation is unfair because he unquestionably incurred expenses in administering Patelco's Plan.
 
 
 60
 The appropriateness of summary judgment turns on whether the reasonable compensation exception can apply to fiduciary self-dealing in violation of §§ 1106(b). If the reasonable compensation exception does not apply to fiduciary self-dealing, then any issues of fact regarding alleged disclosures by Sahni and the reasonableness of the amount of compensation become immaterial.
 
 
 61
 ERISA provisions and Department of Labor regulations support the conclusion that the reasonable compensation exception applies only to transactions with parties in interest (in violation of 29 U.S.C. §§ 1106(a)[13] ) and not to fiduciary self-dealing (in violation of §§ 1106(b)) or a breach of the general duty of loyalty (in violation of 29 U.S.C. §§ 1104(a)(1)(A)). 29 U.S.C. §§ 1106(a) prohibits fiduciaries from causing the plan to engage in specified transactions with parties in interest "[e]xcept as provided in section 1108 of this title." But 29 U.S.C. §§ 1106(b), which prohibits fiduciary self-dealing, makes no mention of the exceptions in §§ 1108. Department of Labor regulations indicate that the exception in §§ 1108(b)(2) applies only to §§ 1106(a), not to §§ 1106(b) or §§ 1104(a).
 
 
 62
 [29 U.S.C. §§ 1108(b)(2)] exempts from the prohibitions of [§§ 1106(a)] payment by a plan to a party in interest, including a fiduciary, for office space or any service . . . . However, [§§ 1108(b)(2)] does not contain an exemption from acts described in [§§ 1106(b)(1)] (relating to fiduciaries dealing with assets of plans in their own interest or for their own account) . . . or [§§ 1106(b)(3)] (relating to fiduciaries receiving consideration for their own personal account from any party dealing with a plan in connection with a transaction involving the assets of the plan). Such acts are separate transactions not described in [§§ 1108(b)(2)] . . . . [§§ 1108(b)(2)] does not contain an exemption from other provisions of the Act, such as [§§ 1104] . . . .
 
 
 63
 29 C.F.R. §§ 2550.408b-2(a). More importantly, DOL regulations also suggest that §§ 1108(c), specifically at issue here, does not establish an independent exception, but rather only modifies §§ 1108(b).
 
 
 64
 [Section 1108(b)(2)] refers to the payment of reasonable compensation by a plan to a party in interest for services rendered to the plan. [Section 1108(c)(2)] and §§§§ 2550.408c-2(b)(1) through 2550.408c-2(b)(4) clarify what constitutes reasonable compensation for such services.
 
 
 65
 29 C.F.R. §§ 2550.408c-2(a); accord Donovan v. Daugherty, 550 F. Supp. 390, 404 (S.D. Ala. 1982).
 
 
 66
 The few cases that have considered the applicability of §§ 1108 to §§ 1106(b) are in accord that reasonable compensation does not apply to fiduciary self-dealing. See LaScala v. Scrufari, 96 F. Supp. 2d 233, 238-39 (W.D.N.Y. 2000) ("The court finds that [§§ 1108(c)]'s reasonable compensation exemption, even if `distinctly operative,' will not provide a safe harbor to a plan fiduciary . . . who has allegedly violated [§§ 1106(b)]."); Daniels v. Nat'l Employee Benefit Serv., Inc., 858 F. Supp. 684, 693 (N.D. Ohio 1994) ("Thus,§§ 1108 does not apply to §§ 1106(b), because fiduciaries are prohibited from receiving consideration--whether or not reasonable--from a third party for transactions involving the plan to which they owe their fiduciary obligations."); Whitfield v. Tomasso, 682 F. Supp. 1287, 1304 (E.D.N.Y. 1988) ("[T]he exemptive provisions of sections [1108(b)(2)] and [1108(c)(2)] apply only to violations of section [1106(a)], not violations of [1106(b)]."); Gilliam v. Edwards, 492 F. Supp. 1255, 1264 (D.N.J. 1980) (noting in dicta that 29 C.F.R. §§ 2550.408c-2(a) suggests that §§ 1108(c) has no "independent exemptive power"). Under this reasoning, §§ 1108(c)(2) does not provide a safe harbor to fiduciaries who self-deal. The Gilliam court, referring to §§ 1108(b), summarized this principle:
 
 
 67
 Section §§ 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, §§ 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. In essence, a combined reading of §§§§ 1106 and 1108 and the relevant regulation suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered--this rule is preserved by the §§ 1108 exemption--may not if self-dealing is involved in the transaction securing the payment.
 
 
 68
 492 F. Supp. at 1263 (citation omitted).
 
 
 69
 We conclude that the reasonable compensation provision does not apply to fiduciary self-dealing; therefore, any factual disputes about Sahni's alleged disclosures are immaterial. Summary judgment was thus appropriate if the undisputed facts established that Sahni engaged in self-dealing.
 
 
 70
 It is undisputed that Sahni received commissions from insurance companies with whom he placed Patelco's coverage, in violation of §§ 1106(b)(3). By his own admission, it is also undisputed that Sahni paid insurance premiums for Patelco's coverage but marked up those premiums when charging that expense to Patelco, in violation of §§ 1106(b)(1). And, viewing the evidence in the light most favorable to Sahni, it is undisputed that at the very least[14] he determined his own administrative fees and collected them himself from the Plan's funds, in violation of §§ 1106(b)(1). Finally, it is undisputed that Sahni received, deposited, and has failed to account for two benefits checks from Standard Insurance made payable to Patelco in violation of §§ 1106(b)(1). Thus, the undisputed facts establish, as a matter of law, that Sahni breached his fiduciary duties by engaging in prohibited self-dealing.
 
 
 71
 Finally, in answer to Sahni's argument that disallowing him to retain any compensation would be unfair:"The apparent harshness of this rule is mitigated by§§ 1108(a), which permits the Secretary of Labor to grant exemptions from §§ 1106(b) restrictions if special formal procedures are followed." Gilliam, 492 F. Supp. at 1263 n.7. Sahni does not contend that he followed those procedures. Accordingly, the district court did not err in concluding that Sahni had breached his fiduciary duties as a matter of law.
 
 6. THE AMOUNT TO BE RESTORED
 
 72
 Having correctly concluded that Sahni breached his fiduciary duties, Judge Illston next determined the amount that he would be required to restore to the Plan. Sahni argues that a hearing was necessary to resolve factual issues about what funds he spent for the benefit of Patelco, namely, paying claims. As discussed below, Judge Illston rejected an accounting proffered by Sahni because it was contradictory and relied on documents that Judge Schnacke had excluded as unreliable. Because Sahni's proffered accounting was insufficient to establish the amount of funds spent on behalf of the Plan, Judge Illston correctly awarded restoration for the full amount of unaccounted funds.
 
 
 73
 In determining the amount that a breaching fiduciary must restore to the Funds as a result of a prohibited transaction, the court should resolve doubts in favor of the plaintiffs. This course [would] avoid the . . . unfair result[ ] of . . . depriving the plaintiffs of any recovery simply because the defendants have made it difficult to disentangle the prohibited transaction. We adopt this principle in this case and place squarely on the breaching fiduciary the burden of demonstrating what portion of [his] activities. . . benefitted the Funds.
 
 
 74
 Kim v. Fujikawa, 871 F.2d 1427, 1430-31 (9th Cir. 1989) (alteration and omission in last sentence added) (quotations and citations omitted). Sahni failed to carry his burden, and the district court was correct to resolve the doubt in favor of the Plan.
 
 C. Rejection of Evidence
 
 75
 A district court's decision to exclude evidence in the context of summary judgment is reviewed for abuse of discretion. National Steel Corp. v. Golden Eagle Ins. Co. , 121 F.3d 496, 502 (9th Cir. 1997); Maljack Productions, Inc. v. GoodTimes Home Video Corp., 81 F.3d, 881, 886 (9th Cir. 1996). Sahni argues that Judge Illston erred in excluding documentary evidence (checks written from the claims account) that he wished to rely upon in proving the amount of funds that were spent on behalf of the Plan. He also argues that Judge Illston erred in excluding the declaration of one of his attorneys, Donald Lowell Bailey.
 
 
 76
 Judge Illston did not abuse her discretion in concluding that Sahni's accounting was unreliable and thus insufficient either to raise a material issue of fact or to carry Sahni's burden of proving the amount of funds that were used to benefit the Plan. Sahni's purported accounting was unreliable because it included checks which had been excluded by Judge Schnacke as unverifiable. Moreover, Sahni's record-keeping (or lack thereof) contained admitted inconsistencies which further undermined the reliability of his proffered accounting. Because this same excluded evidence and imprecise record keeping was relied upon by Sahni's declarant, Judge Illston likewise did not abuse her discretion in excluding the declaration.
 
 D. Sanctions
 
 77
 A district court's sanction order is reviewed for abuse of discretion whether imposed pursuant to Rule 11, Rule 37, or 28 U.S.C. §§ 1927. See Barber v. Miller, 146 F.3d 707, 709 (9th Cir. 1998), Valley Eng'rs, Inc. v. Elec. Eng'g Co., 158 F.3d 1051, 1052 (9th Cir. 1998), and Salstrom v. Citicorp Credit Serv., Inc., 74 F.3d 183, 184 (9th Cir. 1996), respectively. A district court abuses its discretion in imposing sanctions when it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Weissman v. Quail Lodge, Inc., 179 F.3d 1194, 1198 (9th Cir. 1999). The district court's orders may be affirmed on any ground finding support in the record. Smith v. Block, 784 F.2d 993, 996 n.4 (9th Cir. 1986).
 
 
 78
 Sahni argues that Judge Armstrong erroneously viewed his motion in limine as a discovery motion. He argues that the motion sought to prohibit Patelco from introducing evidence, the production of which it had earlier objected to on relevance grounds. Judge Armstrong carefully set forth the facts underlying the 1991 discovery request at issue and concluded that "[a] motion to compel pursuant to Rule 37 is the proper vehicle to address instances where the responding party fails to make or cooperate in providing the requested discovery . . . . Thus, defendants' motion is, in essence, a motion to compel discovery from plaintiffs." It was not an abuse of discretion for Judge Armstrong to deny Sahni's motion and conclude that "Defendants' failure to obtain the requested documents is due to their own lack of diligence."
 
 
 79
 Sahni also argues that Patelco's request for sanctions did not comply with the technical requirements of Federal Rule of Civil Procedure 11. Specifically, Sahni contends that Patelco did not move for sanctions separately or provide the 21-day safe-harbor period, as required by Rule 11(c)(1)(A). Patelco counters that these procedural requirements should not be applied because it was Sahni who moved, on the eve of trial, to exclude the evidence and for sanctions, and Patelco had no choice but to respond immediately and make its own request for sanctions. The Advisory Committee's notes support Patelco's position:
 
 
 80
 As under former Rule 11, the filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions. However, service of a cross motion under Rule 11 should rarely be needed since under the revision the court may award to the person who prevails on a motion under Rule 11--whether the movant or the target of the motion --reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.
 
 
 81
 Fed. R. Civ. P. 11, advisory committee's note to 1993 amend. A party defending a Rule 11 motion need not comply with the separate document and safe harbor provisions when counter-requesting sanctions.
 
 
 82
 In addition, although Judge Armstrong relied upon Rule 11 in her sanctions order, Patelco's counter-request for sanctions also cited Rule 37, which provides an adequate alternate basis for upholding the sanctions order. Rule 37(a)(4)(B) allows for attorney's fees to be awarded to a party who successfully defends a motion to compel. Sahni's motion sought, in the alternative, to compel discovery and continue the trial. Accordingly, attorney's fees (which is what Sahni was sanctioned) could properly have been awarded on this basis.[15]
 
 V. CONCLUSION
 
 83
 For the reasons expressed above, the judgment entered by the district court is AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (1974).
 
 
 [2]
 Racketeer Influenced and Corrupt Organizations Act, Pub. L. No. 91-452, 84 Stat. 941 (1970).
 
 
 [3]
 Sahni had also sought sanctions in this motion, and Patelco responded with a counter request for sanctions. Judge Armstrong orally ruled against Sahni's motion for sanctions and took Patelco's motion for sanctions under consideration. In the February 14, 1994 order, Judge Armstrong ruled that Patelco was entitled to sanctions of attorney's fees and costs in responding to the motion, but left the amount to be determined after submission by Patelco's counsel of a declaration detailing the services performed and the basis for the fees and costs requested. The award of sanctions was imposed against defendants and their counsel jointly and severally. The award against counsel is the basis for appeal No. 99-15718. This issue is discussed in Part IV(C).
 
 
 [4]
 Judge Armstrong also stated that"[Sahni's] request for sanctions based on the contention that plaintiffs willfully evaded their discovery obligations is itself frivolous, and justifies sanctions."
 
 
 [5]
 Previously, on the eve of trial, Sahni had moved to amend his answer to include a statute of limitations defense. The motion was denied by Judge Armstrong in her February 14, 1994 order discussed above.
 
 
 [6]
 This appears to be a clerical error. All throughout the order the figure $131,309.07 was used; however, the "Conclusion" of the order awards $131,307.07.
 
 
 [7]
 Home Placement Serv. v. Providence Journal Co., 819 F.2d 1199 (1st Cir. 1987), cited by Sahni, is distinguishable. Although suggesting that a new trial would have been required after a bench trial if the judge had become unavailable before entering findings of fact, id. at 1202-03, the stated rule appeared premised on the assumption that findings of fact were indeed necessary. (A new trial was not ordered, however, because the original judge had ruled on the issue of liability before becoming unavailable.) Where no genuine issues of material fact exist, arguably findings of fact are not required and proceeding on summary judgment is appropriate (as discussed below). The question then becomes whether summary judgment was properly granted.
 
 
 [8]
 In any event, Judge Illston's order did comply with Rule 63. Her order states: "Pursuant to Rule 63 . . . the Court has determined that no further trial or hearing is necessary . . . and hereby enters the following order based on the record developed in this action." This is sufficient to comply with Rule 63. See Canseco, 97 F.3d at 1227; Mergentime, 166 F.3d at 1266.
 
 
 [9]
 ERISA §§ 404(a)(1)(A).
 
 
 [10]
 ERISA §§ 406(b).
 
 
 [11]
 ERISA §§ 409(a).
 
 
 [12]
 ERISA §§ 408(c).
 
 
 [13]
 ERISA §§ 406(a).
 
 
 [14]
 Viewing the situation in a light less favorable to Sahni, Patelco contends that he outright embezzled the funds because the alleged fees were never disclosed or approved. On summary judgment, we must reject this inference; however, even without it, the facts demonstrate that Sahni dealt with the assets of the plan in his own interest or for his own account.
 
 
 [15]
 Rule 11(d) specifically exempts discovery motions and objections from its procedural requirements.