28    *James, et al. v. Pirelli Armstrong
Tire Corp., et al.*                    No. 00-6475

answers in response to their inquiries, established an independent ground for their breach of fiduciary duty claims. Specifically, we note that Plaintiffs Clay James, Vada Haston, Don Rosso, Bobby Richardson, Roy Kemp, Andrew and Ruby Panzera, Emery Paul Skelley, B.L. Cook, and Ernest Custer established their breach of fiduciary duty claims on this basis because they asked questions about the future benefits of the plan and received inaccurate answers to their queries, or responses that were less than "complete and accurate information material to the beneficiary's circumstance." *Krohn*, 173 F.3d at 547.

## CONCLUSION

Because Pirelli, on its own initiative, provided all Plaintiffs with materially misleading or inaccurate information about the future benefits of the plan and because Pirelli provided ten Plaintiffs with materially misleading or inaccurate information in response to their direct questions about the possibility of their benefits changing under the OPS plan, Plaintiffs thus established that Pirelli breached its fiduciary duty to them. We therefore **REVERSE** the district court as to all Plaintiffs and **REMAND** the case for further proceedings consistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0318P (6th Cir.)
File Name: 02a0318p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

CLAY K. JAMES, et al.,
    *Plaintiffs-Appellants,*

    v.

PIRELLI ARMSTRONG TIRE
CORPORATION,
    *Defendant-Appellee.*

No. 00-6475

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 95-00421—Robert L. Echols, Chief District Judge.

Argued: March 21, 2002

Decided and Filed: September 17, 2002

Before: BATCHELDER and CLAY, Circuit Judges;
ALDRICH, District Judge.

_____

[*] The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

———————————

**COUNSEL**

**ARGUED:** Hugh C. Howser, Jr., MILLER & MARTIN, LLP, Nashville, Tennessee, for Appellants. Richard L. Colbert, COLBERT & WINSTEAD, Nashville, Tennessee, for Appellee. **ON BRIEF:** Hugh C. Howser, Jr., Kara E. Shea, MILLER & MARTIN, LLP, Nashville, Tennessee, for Appellants. Richard Lee Colbert, COLBERT & WINSTEAD, Nashville, Tennessee, for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Plaintiffs, twenty-one former employees of Defendant Pirelli Armstrong Tire Corporation ("Pirelli" or "the company") or its predecessor in interest, Armstrong Rubber Company ("Armstrong"), appeal from the judgment dismissing their claims of breach of fiduciary duty arising under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001-1461. During the relevant time periods, Plaintiffs were salaried employees or retired salaried employees at Pirelli's plant in Madison, Tennessee. For the reasons set forth below, we **REVERSE** the district court's judgment and **REMAND** the case for further proceedings.

**BACKGROUND**

Pirelli is a Delaware corporation with headquarters in New Haven, Connecticut, and is in the business of tire production. Pirelli bought the Madison, Tennessee plant from Armstrong in 1988. Pirelli provided medical benefits for its salaried employees and retired salaried employees through group insurance policies with Connecticut General Life Insurance Company, including a 1980 policy, a 1984 policy, and a 1988 policy. Pirelli had the right to terminate the 1980 policy by

Madison, Tennessee, misleading or inaccurate information about the future benefits of the plan.

Here, the district court erred in finding that Pirelli did not breach its fiduciary duty as to all Plaintiffs. Pirelli's breach of its fiduciary duty occurred when the company provided, on its own initiative, materially misleading and inaccurate information about the plan benefits to Plaintiffs in group meetings and exit interviews. As already indicated, Pirelli's fiduciary duty to Plaintiffs was triggered even though not all Plaintiffs asked specific questions about the future benefits of the plan. As the district court found, Pike, Pirelli's human resources representative at the plant in Madison, Tennessee, and Wright, the plant manager, provided inaccurate and misleading information to Plaintiffs about their retirement benefits during group meetings and exit interviews conducted in connection with Pirelli's effort to reduce its salaried workforce. Both Pike and Wright falsely informed the salaried employees, including Plaintiffs, that their medical benefits would not change during retirement. However, as recognized by Willard, Pirelli's General Counsel and Secretary, Pike provided inaccurate information when she indicated to employees that the company could not change their benefits during retirement. Thus, it is clear that Pirelli, on its own initiative, provided misleading and inaccurate information about the plan benefits to Plaintiffs. Further, the false and inaccurate information provided by Pike and Wright to Plaintiffs constituted material misrepresentations because there was a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision. *See McMunn,* 161 F. Supp. 2d at 120. And Plaintiffs relied upon these materially misleading representations to their detriment in deciding to take early retirement. Thus, Plaintiffs established that Pirelli breached its fiduciary duty to them.

Alternatively, we also find that those Plaintiffs who specifically asked Pike about the future benefits of the plan, but received materially misleading, inaccurate or incomplete

only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Krohn*, 173 F.3d at 548; s*ee also Mullins v. Pfizer, Inc.*, 23 F.3d 663, 668 (2d Cir. 1994) (noting that "when a plan administrator speaks, it must speak truthfully").

Thus, with respect to the situation presented when an employer on its own initiative disseminates false and misleading information about a benefit plan, the position of the Sixth Circuit is aligned with that of the Third Circuit in *Unisys*. As in *Unisys*, where the Third Circuit found that the reservation of rights provision did not protect an employer from liability for a breach of fiduciary duty when the employer deliberately fostered the belief that retirement benefits are lifetime benefits, *Sprague* does not stand for the proposition that a reservation of rights provision insulates an employer from liability for a breach of its fiduciary duty under ERISA when the employer disseminates materially false or misleading information on its own initiative about the future benefits of a plan. In short, an employer or plan administrator fails to discharge its fiduciary duty to act solely in the interest of the plan participants and beneficiaries when it provides, on its own initiative, materially false or inaccurate information to employees about the future benefits of a plan. Under these circumstances, it is not necessary that employees ask specific questions about future benefits or that they take the affirmative step of asking questions about the plan to trigger the fiduciary duty. The breach of fiduciary duty occurs when the employer or plan administrator on its own initiative provides misleading information about the future benefits of a plan.

In the instant case, both conditions (1) and (2) outlined in *Sprague* are at issue. Condition (1) applies because some Plaintiffs specifically put questions to Pike of Pirelli about the plan, and received misleading and inaccurate answers to their inquiries. But condition (2) also applies because Pirelli on its own initiative provided, through its representatives in

giving the insurance company advance written notice, as well as the right to amend the policy with the insurance company's approval. In 1981, Armstrong gave its salaried employees a Summary Plan Description ("SPD"), which stated as follows under the heading "Termination of Insurance":

> Your insurance will terminate when you are no longer a member of an eligible class of employees, when the group policy terminates or when you are no longer working for the employer, whichever happens first. However, if you retire, your life insurance and your Medical Care Benefits (other than pregnancy benefits) will be continued until the employer stops payment of premiums for you.

> The insurance for a family member terminates when your insurance terminates, or when the family member is no longer eligible, whichever happens first.

> Under certain circumstances, it may be possible to continue part or all of your insurance during temporary lay-off, plant closures or leave of absence or when you are unable to work because of sickness or injury. It may also be possible for the insurance to continue on your family members after your death. See your Benefit Plan Administrator for this information.

The 1981 SPD contained no other language regarding modification or termination of medical benefits. The 1984 and 1988 policies had the same or substantially the same provisions regarding cancellation and amendment, and the 1981 SPD was relied upon until 1989, when Pirelli distributed a new SPD. This SPD contained a provision in which Pirelli reserved the right to modify or terminate the plan at any time. Under the section concerning the Comprehensive Medical Insurance Plan, the 1989 SPD provided:

D.   WHEN YOUR COVERAGE ENDS

Please refer to Section L of the Handbook for details concerning termination of coverage under this Plan.

Similarly, in the section about the Prescription Drug plan, the 1989 SPD provides:

C.   WHEN COVERAGE ENDS

Please refer to Section L of the Handbook for details concerning the termination of your coverage in the event you cease to be an active employee. In certain circumstances you may be able to continue to have coverage and this is explained.

However, Section L of the handbook, entitled Termination of Benefits, was left blank when the 1989 SPD was distributed, and Pirelli never issued any materials to be placed in that space. Despite being presented to employees in 1989, the 1989 SPD was not actually implemented until 1993.

From 1986 through 1990, Armstrong and Pirelli, in an effort to reduce their salaried workforce, encouraged employees to take early retirement. After acquiring the Madison plant, Pirelli held a series of meetings in December of 1989, with groups of salaried employees to encourage eligible employees to take early retirement. During these meetings, salaried employees were given copies of the 1989 SPD and were encouraged to consider retirement before the end of 1990 to avoid anticipated increases in the cost of health insurance and other major changes in employees' health insurance benefits, effective January 1, 1991, when an increase in the cost of health insurance was expected to go into effect.

Thereafter, in July of 1990, Pirelli put into effect an Optional Pension/Severance ("OPS") plan, again seeking to encourage early retirement by providing various incentives. Pirelli provided written descriptions of the OPS plan to its

by "the alleged representations by Armstrong/Pirelli that benefits would continue during retirement for the lifetime of the plaintiffs." *Id*. The district court noted that in *Unisys*, the Third Circuit ruled that the reservation of rights provision did not protect an employer from liability for a breach of fiduciary duty "where a company has deliberately fostered the belief that retirement benefits are lifetime benefits, and is aware that its employees incorrectly – if understandably – believe that their medical benefits will continue unchanged for the duration of their retirement." *Id*. at 124 (citing *Unisys*, 57 F.3d at 1265 n.15). Thus, relying upon *Unisys*, the district court in *McMunn* found that "by continuing to assure plaintiffs that they would receive the same benefits in retirement until their death without reference to the reservation of rights, defendant failed to convey complete and accurate information, and instead provided materially misleading information," upon which three of the plaintiffs detrimentally relied. *Id*. Accordingly, the district court in *McMunn* held that Pirelli breached its fiduciary duty to these plaintiffs when it materially misled them by "deliberately foster[ing] the belief that retirement benefits are lifetime benefits." *Id*.

Turning back to *Sprague*, although we found that there was no breach of fiduciary duty where GM had issued booklets containing a reservation of rights clause, *Sprague* does not stand for the proposition that a reservation of rights provision in a SPD necessarily insulates an employer from its fiduciary duty to provide "complete and accurate information" when that employer *on its own initiative* provides inaccurate and misleading information about the future benefits of a plan. Indeed, *Sprague* explicitly allows for a breach of fiduciary duty claim under such a circumstance. Were it otherwise, an employer or plan administrator could provide, on its own initiative, false or inaccurate information about the future benefits of a plan without breaching its fiduciary duty under ERISA, simply because of the existence of a reservation of rights provision in the plan. However, this would be contrary to the basic concept of a fiduciary duty, which "entails not

"when a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." *Id*.

A similar situation was also addressed in *McMunn v. Pirelli Tire*, which dealt with whether Pirelli breached its fiduciary duty to its employees when it materially misled them about retirement medical benefits. 161 F. Supp. 2d at 97. As in this case, Pirelli, as part of its plan to reduce its salaried workforce by about ten percent, offered the OPS plan in July of 1990 to induce voluntary retirement. Pirelli affirmatively represented to its employees that "the single/family deductible under the medical plan will be $100/$200 during the individual's retirement." *Id*. at 108. Similar to this case, a Pirelli representative, in a prepared script, stated that one of the benefits of the OPS retirement plan was to allow retirees "the opportunity to act now to obtain a $100/200 deductible during retirement and not be affected by the upcoming changes in retirement insurance." *Id*. The principal focus of the dispute therefore was whether Pirelli's statements about the future benefits of the plan "constituted an affirmative misrepresentation by defendant that it would not exercise its right to alter or terminate these benefits during the retiree's lifetime and until the death or remarriage of his spouse, or was simply a description of the then-current policy and intention, which as a matter of law could be changed at a later date absent vesting language." *Id*. at 123.

The district court noted in *McMunn* that while "any employees who were expressly told by a person acting in a fiduciary capacity that their retirement benefits could not be changed during retirement received affirmative misrepresentations," there was no material misrepresentation when a fiduciary made "the simple statement" that "benefits 'will continue in retirement' without any durational limit." *McMunn*, 161 F. Supp. 2d at 123. The court nonetheless recognized that a more troublesome question was presented

salaried employees and required all salaried employees to attend one of several mandatory meetings. Pirelli corporate headquarters also provided information about the OPS plan for Pirelli's plant managers to disseminate to salaried employees at these meetings. The information included a script for the plant manager to read to the salaried employees at the group meetings, a slide presentation and a recorded audio presentation. At these meetings, Charles Wright, the plant manager, read the scripted presentation, while Shirley Pike, the Assistant Employee Relations Manager, and a human resources liaison since 1987, made a slide presentation and a recorded audio presentation, and answered employees' questions. Salaried employees were told in the script read by plant manager Wright that "[o]ur plan affords many of you the opportunity to act now to obtain a $100/$200 deductible during retirement and not be affected by the upcoming changes in retirement insurance." (J.A. at 108.) Wright testified that he told the salaried employees that their medical benefits would not change during their retirement. Employees also received a copy of a letter from Paul C. James, Pirelli's President, and a written description of the OPS plan. These materials informed the employees that early retirees would receive the benefit of the lowest deductible ($100/$200) and maximum out-of-pocket expense amounts ($300/$400) available for salaried employees, that they would receive these reduced deductibles and maximum out-of-pocket expenses "during retirement," and that they would not be affected by the upcoming changes in retirement insurance. Employees were generally told to bring any questions they might have to Pike, and many of them did just that.

In answering employees' questions, Pike consulted the company's current SPD and personnel policy directive book, and if those sources did not provide an answer, she would call corporate headquarters for assistance. Pike testified that her actions were in conformity with the procedures established by Armstrong and Pirelli. However, Pike admitted that she did not have the OPS plan documents in her Nashville office – in fact, she had never seen or read them during her employment

with Armstrong and Pirelli. According to Pike, the OPS plan documents were in the corporate office in New Haven, Connecticut and were not available for examination in the Employee Relations Department in Nashville.

When employees who were at meetings with Pike asked her how long their benefits would last, she would tell them: during retirement. In her testimony, Pike defined "retirement" to mean during their lifetimes and the lives of their spouses unless the latter remarried. (J.A. at 350.) Pike also informed employees that their benefits would remain unchanged during their lifetimes. When employees asked Pike about language in the SPD that allowed the company to alter or amend the plan, Pike stated that it was written for the benefit of Pirelli to enable the company to change insurance carriers. As Pike put it, "If I had that discussion, I am sure I would have talked about insurance carrier." (J.A. at 354-55.) Although Pike could not remember if anyone from corporate headquarters inquired to determine whether she was disseminating accurate information, she admitted that no one from the company told her that her statement that medical benefits would remain unchanged during their lifetimes and that of their spouses unless they remarried was inaccurate because Pirelli reserved the right to change the OPS plan. Pike also admitted that she did not know whether she had the role of a fiduciary relating to the dissemination of information about the OPS plan to the company's employees because she was not sure what a "fiduciary" is. Pike added that to the best of her knowledge, the company provided her with truthful and accurate information to present to the employees and the plan beneficiaries, and that the company advised her to answer questions posed by employees about the benefits so as not to mislead them. In any event, Pike testified that she did not intentionally mislead any employees with the information that she provided to them.

However, as acknowledged by Pirelli's General Counsel and Secretary, Sherwood Willard, it would have been prudent for Pike to have read the OPS Plan and to have had a copy of

Had an early retiree asked about the possibility of the plan changing, and had he received a misleading answer, *or had GM on its own initiative provided misleading information about the future of the plan*, or had GM been required by ERISA or its implementing regulations to forecast the future, *a different case would have been presented*. But we do not think that GM's accurate representations of its current program can reasonably be deemed misleading. GM having given out no inaccurate information, there was no breach of fiduciary duty.

133 F.3d at 405-06 (emphasis added). As can be discerned, *Sprague* analyzes a possible breach of fiduciary duty in terms of three disjunctive conditions. A breach of fiduciary duty occurs if (1) an early retiree asks a plan provider about the possibility of the plan changing and receives a misleading or inaccurate answer or (2) a plan provider *on its own initiative* provides misleading or inaccurate information about the future of the plan or (3) ERISA or its implementing regulations required the employer to forecast the future and the employer failed to do so.

While *Sprague* concluded that there was no breach of fiduciary duty because none of these conditions was met, *Krohn* found that the first condition was satisfied when the plan administrator breached its fiduciary duty by not providing complete and accurate information in response to the participant's questions about available benefits. However, neither case addressed the situation presented when an employer *on its own initiative* provides false and misleading information to employees about future benefits of a plan.

This factual scenario was presented in *Unisys* where the Third Circuit affirmed the district court's order finding that the plaintiffs could maintain a claim for breach of fiduciary duty under ERISA since "Unisys affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life." *In re Unisys Corp.*, 57 F.3d at 1264. As the Third Circuit noted,

about whether those benefits would continue during retirement. They argue that ten Plaintiffs – Clay James, Vada Haston, Don Rosso, Bobby Richardson, Roy Kemp, Andrew and Ruby Panzera, Paul Skelley, B.L. Cook, and Ernest Custer – all testified that they, like Jarrard and Fitzsimmons, addressed direct questions to Pirelli's representatives, primarily Pike, and received misleading information in response. They further argue that all other Plaintiffs should recover too, despite never asking specific questions, because they were also provided with inaccurate, incomplete, and misleading information.

The district court found that Fitzsimmons asked about the reservation of rights after reading about it in an article and that Jarrard asked about it after reviewing his handbook. Both men were inaccurately told that they should not worry about the reservation of right, because it only gave the company the right to change insurance carriers. The district court was correct to conclude that, under *Krohn*, Pirelli was under a fiduciary obligation to provide complete and accurate answers to Fitzsimmons's and Jarrard's questions about the reservation of rights provision, and that it failed to do so. The district court also found that no plaintiff presented evidence that Pirelli deliberately misled employees or retirees, and that any statements by Pirelli suggesting that retirees' benefits would continue "for life" were true under the plan as it existed at that time and as it had existed since 1969. Furthermore, the court found (and Plaintiffs admitted) that there was no evidence suggesting that either Armstrong or Pirelli was planning to modify or terminate medical benefits in 1993.

## II.

In determining whether Pirelli breached its fiduciary duty to Plaintiffs, we begin with an analysis of *Sprague*, where this Court stated:

it in her office because she was responsible for providing accurate information to employees about the terms and conditions thereof. Willard also admitted that if Pike told employees that the company could not change their benefits during retirement, then she was not providing accurate information. Willard further acknowledged that if Pike told employees that the language in the SPD concerning the company's right to alter or amend the OPS Plan meant that the company could change insurance carriers, then that information was also incorrect.

In January of 1993, Pirelli adopted a new health care plan setting forth the terms of its medical benefit plan for salaried employees and retirees. Subsequently, in February of 1993, all retired salaried employees received a letter advising them that Pirelli had unilaterally changed the terms of their health insurance benefits. As stated in the written stipulation of facts, Plaintiffs incurred greater out-of-pocket expenses for health care under Pirelli's 1993 plan than they would have incurred if their medical benefits had not changed. In 1994, Pirelli again revised its medical benefit plan, increasing premium contributions, deductibles and maximum out-of-pocket amounts for Plaintiffs in 1995 and 1996.

As Pirelli points out, Plaintiffs fall into four distinct groups based upon when they retired. Five Plaintiffs retired in 1986 or 1987 before Pirelli acquired the Madison plant. Those Plaintiffs are Dewey Meador, Donald Rosso, Bobby Richardson, Roy Kemp and Vada Haston. A second group consists of Plaintiffs who retired in 1990 before the announcement of the OPS program in July 1990. These Plaintiffs are Joe Smith, Paul Skelley, Jr., and Doyle Denton. A third group of Plaintiffs retired in 1990 and 1991 under the OPS program. These Plaintiffs are Clay James, Ernest Custer, John G. Carney, Dean Carney, Ruby Panzera, Andrew Panzera, Billy Fykes, B.L. Cook and Robert Adkins. The final Plaintiff is James Wallace, who retired in 1992.

At the bench trial, Plaintiffs provided testimony about the information supplied to them at the meetings when Pirelli induced them to take early retirement or resign. Clay James, who accepted early retirement on September 28, 1990 at age 58, testified that after attending mandatory meetings about the OPS plan with other employees in the summer of 1990, he met privately with Pike to talk about his pension options. According to James, Pike told him "an insurance change . . . will affect you if you stay here as an employee," but that he had "an opportunity to lock in on the benefits as of today regardless even if you retire and work on into 1991." Specifically, Pike told James that he would get the benefits of "a hundred/200 dollars deductible, 300/400 dollars max . . . ." (J.A. at 213-14.)

Vada Haston testified that she was offered early retirement as part of Armstrong's reduction in force program in 1986. Before accepting early retirement on May 1, 1986, Haston met with Pike who assured her that if she took early retirement, she and her husband would receive all the medical benefits that they had while she was employed, except for dental and eye care. According to Haston, Pike told her benefits would be "[f]or as long as I lived" or "for life," and that "in the case of my husband, if he should outlive me, until his death, unless he remarried." Haston testified that Pike also advised her that her husband should drop other coverage that he had; when Haston asked "over and over again if he would be covered," Pike told her that "he would be . . . for life." (J.A. at 845-46.)

Don Rosso, who retired in June of 1987 at the age of 51, also testified that he relied upon representations that Wright and Pike made during both group meetings and private interviews in opting for early retirement by bridging three years of service. According to Rosso, Wright assured him at the group meeting that he would "get to keep [his medical benefits] for the rest of [his] life." (J.A. at 230-31.) Afterwards, Rosso met privately with Pike and asked her about medical benefits he and his wife would get upon

provide proof of disability within 90 days of September 17, 1992, the date on which the 180-day elimination period ended. A prudent fiduciary acting in the best interest of its beneficiary would have advised Krohn that failure to submit a claim and proof of loss to UNUM in a timely fashion would render her ineligible to receive long-term disability benefits.

*Krohn*, 173 F.3d at 549-50.

In reaching this conclusion, we noted that "a fiduciary breache[s] its duties by materially misleading plan participants, regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Id.* at 547 (citing *Berlin*, 858 F.2d at 1163-64). Furthermore, the Court approved of cases from other circuits holding that "once an ERISA beneficiary has requested information from an ERISA fiduciary who is aware of the beneficiary's status and situation, the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, *even if that requires conveying information about which the beneficiary did not specifically inquire.*" *Id.* (emphasis added; citations omitted). The Court agreed with other circuits that "the 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.'" *Id.* at 548 (quoting *Bixler v. Cent. Pa. Teamster Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir. 1993)). We therefore held that the fiduciary breached its duty on the basis of its negligent omission, that is, by failing to inform Krohn about her eligibility for long-term benefits after Krohn inquired generally about what benefits were available, despite the fact that Krohn did not specifically ask about long-term benefits. *Id*. at 549.

Relying on *Krohn*, Plaintiffs suggest that Pirelli breached its fiduciary duty by not responding completely and accurately to Plaintiffs' questions about their health benefits, particularly

direct questions about the effect of the reservation of rights clause on future benefits gave rise to fiduciary liability under *Krohn*.

In *Krohn*, this Court held that a plan administrator breached its fiduciary duty to a participant by not providing complete and accurate information in response to the participant's questions about available benefits. The participant was an employee who had been in a car accident. *Krohn*, 173 F.3d at 545. At the time of her accident, Krohn was eligible for both short-term and long-term disability benefits. The short-term benefits were available on the fifteenth day of an injury up to a maximum of $200 per week, for up to twenty-six weeks. The long-term benefits were available on the 180th day of an injury up to a maximum of $3000 per month, until age sixty-five (twenty-three years in Krohn's case). When asked about what benefits would be available to Krohn, however, a personnel assistant responded only that short-term disability was available and that most employees involved in automobile accidents found it advantageous to take short-term disability and recover under their automobile insurance for lost wages. *Id*. at 546. Krohn elected this option. Three years later, her benefits under her auto insurance expired, and she applied for long-term disability benefits under the plan. Under the terms of the policy, however, Krohn had been obligated to give notice within thirty days of the accident of her intent to apply for long-term benefits, and her application was denied as untimely. *Id.*

We then held as follows:

Our review of the record thus reveals that [the fiduciary] received notice repeatedly that the plaintiff would be eligible for and would need long-term disability benefits. Furthermore, [the fiduciary] knew that in order to secure her right to long-term disability benefits, Krohn was required by the UNUM policy to submit a claim within 30 days of the occurrence of a loss covered by its policy, or as soon thereafter as is reasonably possible, and to

retirement. Pike told Rosso that he would get medical benefits "at no cost" and that his wife would not lose the benefits "unless she divorced . . . or remarried." (J.A. at 232-33.)

Bobby Richardson also retired in June of 1987 at age 53. Before retiring, Richardson went with Roy Kemp to meet with Pike to discuss early retirement. Richardson testified about the meeting with Pike as follows:

Since I had the number of the bridge that they offered me was not enough to get me to 30 years, it only got me to age 55 which left me with my pension being reduced to at least 50 percent or better, which was not much of an incentive. The only thing that was an incentive was the fact that the insurance was – the insurance coverage was better than what I had then and that my concern was with my wife who is a very – comes from a very long-lived family, and I was very concerned about providing for her after my death and made sure that this in fact did that. And [Pike] assured me that it did and so I talked to my wife that night about it and decided to accept it based on that basis even though the financial loss of my pension was bad.

(J.A. at 239.) Richardson testified that the retirement form signed by him provided: "Upon retirement you will have the following benefits at no cost to you . . . . [Your benefits] [r]emain[] the same except your deductible will be decreased to a hundred dollars individual, 200 family and maximum out-of-pocket expense will be 300 individual, 400 family, effective 9-1-88." At the time Richardson retired, he did not have a "deductible of 100/200," and he had a "1200 maximum out-of-pocket expenses for me and my wife." According to Richardson, Pike assured him that after his death the same benefits would remain in effect for his wife.

Roy Kemp, who also retired in 1987 at the age of 53 under the same bridging program as Richardson and Rosso, testified

that at the meeting that he and Richardson attended with Pike, she stated that "I would receive my insurance for me and my wife at no cost to me for a lifetime," except for dental and vision coverage. (J.A. at 244.)

Ruby and Andrew Panzera, who are husband and wife, retired under the July 1990 OPS program after having two individual meetings with Pike. When Mr. Panzera asked Pike if the company could change their health insurance benefits after they retired, Pike answered that "it would not change" and "would remain this way until our death." (J.A. at 255-56.) Mrs. Panzera also testified that Pike told her that she would have prescription drug coverage "for life" and that the company would pay for all of it. (J.A. at 260.)

Emery Paul Skelley, Jr., who retired in June of 1990 at the age of 51, testified that Pike told him that, upon retirement, he would lose his vision and dental coverage, but would keep his prescription drug and medical coverage as well as his retirement benefits for the rest of his life. According to Skelley, he asked Pike whether there was "anything in small print anywhere else in any kind of contract that I lose any of this after I become 65" and whether he kept the benefits coverage "until the day I die." Skelley testified that Pike replied by telling him that "I would until the day I die." (J.A. at 268.) Relying upon Pike's representation, Skelley decided to take early retirement.

B.L. Cook, who retired under the OPS program in July of 1990 at the age of 60, testified that after the group meeting conducted by Wright and Pike, he also met privately with Pike, who assured him that he would receive medical benefits, including prescription drug benefits, "for as long as I live and if I died before my wife then she would receive those benefits as long as she lived providing that she didn't remarry." (J.A. at 280-83.)

Ernest E. Custer, who retired in October of 1990 at the age of 46, testified that after the July 1990 meetings conducted by

changes in benefits or even a planned termination of the plan before those actions become official. *Id.* at 406 (citing *Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2d Cir. 1996); *Payonk v. HMW Indus., Inc.*, 883 F.2d 221, 229 (3d Cir. 1989); *Stanton v. Gulf Oil Corp.*, 792 F.2d 432, 435 (4th Cir. 1986)). This Court therefore concluded that "there can be no fiduciary duty to disclose the *possibility* of a future change in benefits." *Id.*

Pirelli's liability to Jarrard and Fitzsimmons, which Plaintiffs wish to have extended to themselves, stems from the last paragraph of the *Sprague* court's analysis of the fiduciary duty issue, wherein this Court stated:

> Had an early retiree asked about the possibility of the plan changing, and had he received a misleading answer, or had GM on its own initiative provided misleading information about the future of the plan, or had GM been required by ERISA or its implementing regulations to forecast the future, a different case would have been presented. But we do not think that GM's accurate representations of its current program can reasonably be deemed misleading. GM having given out no inaccurate information, there was no breach of fiduciary duty.

*Id.*

Following the bench trial in the matter at hand, the district court concluded that *Sprague* shielded Pirelli from liability as to Plaintiffs, but not as to Fitzsimmons and Jarrard, because the latter two had posed direct questions to Pirelli's contact person, Pike, about the reservation of rights clause in the plan documents, asking what effect the clause might have on their future benefits. In response, Pike told the employees not to worry about that provision and inaccurately explained that the language only meant that the employer could change insurance carriers. Although there was no evidence that Pike deliberately misled Jarrard and Fitzsimmons, the district court held that her negligently rendered misleading responses to

Explanations of benefits

> "tend to sound promissory by their very nature. While these explanations may state a company's current intentions with respect to the plan, they cannot be expected to foreclose the possibility that changing financial conditions will require a company to modify welfare benefit plan provisions at some point in the future." [*Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 857 (4th Cir. 1994).]

> GM's failure, if it may properly be called such, amounted to this: the company did not tell the early retirees at every possible opportunity that which it had told them many times before – namely, that the terms of the plan were subject to change. There is, in our view, a world of difference between the employer's deliberate misleading of employees in *Varity Corp.* and GM's failure to begin every communication to plan participants with a caveat.

*Id.*

The employees in *Sprague* had received prior warnings about the company's right to amend or terminate the plan. In fact, some employees were reminded of that fact during their exit interviews just prior to early retirement. However, the *Sprague* court did not find these previous warnings of the employer's right to modify the plan determinative. Rather, this Court noted that ERISA contains detailed disclosure provisions regulating the contents of summary plan descriptions. *Id.* (citing 29 U.S.C. § 1022(b); 29 C.F.R. § 2520.102-03). Under these provisions, an ERISA fiduciary need not disclose its reservation of the right to amend or modify benefits in plan documents. *Id.*; *see also Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 949 (6th Cir. 1990). We then noted that no court of appeals has imposed fiduciary liability for a failure to disclose information that is not required to be disclosed, and that at least three circuits have held that there is no fiduciary duty to disclose planned

Wright and Pike, he spoke with Pike, who told him that if he retired under the OPS program, he would keep "the 100/200 deductible and the 300/400 maximum out-of-pocket" for his entire retirement. (J.A. at 222-23.)

Joe Smith, who retired on March 1, 1990 at the age of 60, attended a meeting in December of 1989 in which Pike told him and other employees that if they were going to retire, it would be advisable to do so in 1990 because the company was changing its insurance coverage. Smith also met separately with Pike, who told him that "she thought there was a change coming and if you was [sic] going to retire, 1990 would be the time to get out." (J.A. at 247.)

Doyle Denton, who retired in April of 1990 at the age of 63, also attended a meeting in December of 1989 in which Pike advised employees that it would be to their advantage to retire in 1990 because there was going to be a change in medical coverage, effective January 1, 1991. Denton also met separately with Pike, who told him that his medical benefits "were locked in for life" and "wouldn't cost my wife and myself anything," and that, upon retirement, his deductible "would actually decrease down to 100/200 dollars." (J.A. at 273.)

Billy Fykes retired on October 1, 1990 at age 57 under the OPS program of July of 1990. Fykes testified that at the meeting conducted by Wright and Pike in July of 1990, Pike stated that those taking early retirement would receive a 100/200 deductible and "would not be affected by the upcoming changes." (J.A. at 276-78.)

Robert D. Adkins retired in January of 1991 at the age of 57 under the OPS program. After attending the meeting in July of 1990 conducted by Wright and Pike, Adkins met separately with Pike who stated that his health insurance benefits would remain at the 100/200 deductible "[a]s long as I lived." Adkins understood that "I'd have this insurance the rest of my life." (J.A. at 286-87.)

James Wallace, who retired on September 19, 1962 at the age of 60, testified that after attending a meeting in July of 1990 regarding the OPS program, he delayed his retirement because his department manager, who needed Wallace to continue working, advised him that he would be entitled to retire later with all the same benefits if he stayed. Before retiring, Wallace had a meeting with both Pike and Robert Mische, Pike's supervisor. According to Wallace:

> Well, we talked about what my benefits would be in retirement, and I was a little reluctant and the [sic] taking it. I was two years from drawing any Social Security so I didn't know if I could live on what I was going to get. But then in talking with them they assured me that I would have my life insurance and my drug card, my insurance. And Mr. Mische himself said it would be for the rest of my life and he wished at that point that he could get in the same position, and Shirley concurred that she would be in that position. And the fact that two years had transpired since I had talked to them before and decided it was time to go.

(J.A. at 297.)

John and Dean Carney are husband and wife, both of whom retired on October 1, 1990, at ages 52 and 57, respectively. After attending the meetings presenting the OPS program, the Carneys testified that they accepted the OPS program and early retirement because "[w]e were told that [our health insurance benefits] would be locked in and would not change." John Carney testified that he and his wife also had a private meeting with Pike, who assured them that all their medical benefits "would be locked in as they were and would not change if we took this program." (J.A. at 224-25.)

Dewey L. Meador retired on May 1, 1986, at the age of 57. At a meeting with Pike before retiring, Meador was told that "I would retain my same benefits I retired with for the rest of my life and my wife would also." Meador testified that Pike

persuade employees to take early retirement. For more than two decades, GM had provided continuing health insurance benefits to salaried retirees. Although the plan documents and information booklets changed over the years, they all contained statements to the effect that basic health care coverage would be provided to retirees at GM's expense "for your lifetime." *Id.* Most of the booklets, however, also contained a reservation of rights clause, putting employees on notice that GM could amend, modify, suspend, or terminate its benefit plans at any time. *Id.* Early retirees were required to participate in an exit interview, at which many of the early retirees received plan documents, and some of the employees were orally put on notice of GM's right to amend or terminate the plan. *Id.* at 395. The "small number" of early retirees who asked specifically about future changes to health care benefits were accurately told that benefits could be changed in the future. *Id.* In fact, as here, the plan was later modified in a way that adversely affected the retirees.

In addressing the plaintiffs' claims that GM breached its fiduciary duties by modifying the plan, this Court first noted that, although employers do not act in a fiduciary capacity when they amend or terminate a benefit plan, "'conveying information about the likely future of plan benefits' [is] a discretionary act of plan administration" giving rise to a fiduciary duty. *Id.* at 404-05 (quoting *Varity*, 516 U.S. at 504). This Court held that, as a matter of law, GM had not breached this fiduciary duty, noting that "GM never told the early retirees that their health care benefits would be fully paid up or vested upon retirement. What GM told many of them, rather, was that their coverage was to be paid by GM for their lifetimes. This was undeniably true under the terms of GM's then-existing plan." *Id.* The Court added:

if and when to retire." *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993).

Plaintiffs in the matter at hand essentially argue that the district court applied the appropriate case law – namely, *Varity*, *Sprague* and *Krohn* – but applied it incorrectly. Consequently, Plaintiffs seek to have the district court's ruling in favor of Jarrard and Fitzsimmons expanded to encompass all Plaintiffs.

The Supreme Court held in *Varity* that an employer breached its fiduciary duty to former employees and retirees when it induced them to transfer their employment to a newly formed subsidiary that the employer knew was unstable. *See Varity Corp. v. Howe*, 516 U.S. at 505. As the Court noted, "[t]he thrust of Varity's remarks [made at special meetings designed to persuade employees to transfer] . . . was that the employees' benefits would remain secure if they voluntarily transferred to [the subsidiary]." *Id.* at 494. The Court further noted that "[a]s Varity knew, however, the reality was very different." *Id.* The Court therefore easily concluded that Varity had breached its fiduciary duty to the employees, uncontroversially finding that "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Id.* at 506 (internal quotation omitted). Because the employer had deliberately misled its employees, the Court declined to "reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries." *Id.*

In *Sprague*, this Court, sitting *en banc*, explicated the contours of an ERISA fiduciary's duty to disclose information to beneficiaries. Facing a factual scenario similar to the one involved in this case, *Sprague* considered whether General Motors ("GM") breached its fiduciary duties under ERISA by its oral and written representations to early retirees regarding its retirement program. *See* 133 F.3d at 393-94. In that case, GM, in an effort to avoid involuntary layoffs, tried to

did not tell him that the company could change his health insurance benefits at a later date. (J.A. at 228.)

Following a bench trial, the district court, applying the principles set forth in *Varity Corp. v. Howe*, 516 U.S. 489 (1996), *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (*en banc*), and *Krohn v. Huron Memorial Hospital*, 173 F.3d 542 (6th Cir. 1999), issued a decision on January 12, 2000 ruling that Pirelli breached its fiduciary duty only with regard to the two retired salaried employees who are not appellants here, Jack Jarrard and Ron Fitzsimmons. Specifically, the district court found that under *Krohn*, Jarrard and Fitzsimmons were entitled to damages from Pirelli because the company breached its fiduciary duties to them by providing inaccurate and misleading responses to their direct questions regarding ERISA plan benefits as part of early retirement incentive programs. However, as to Plaintiffs, the district court found that Pirelli did not breach its fiduciary duties to them because there was no evidence that Pike or Wright deliberately or negligently misled them in answering their direct questions, or that Pirelli planned in advance to modify their retiree medical benefits years later.

Thereafter, Plaintiffs filed a motion seeking to amend and/or make additional findings of fact regarding the district court's January 12, 2000 order, claiming that the principles articulated in *Sprague* and *Krohn* required that the court's ruling with respect to Jarrard and Fitzsimmons be extended to them. The district court denied this motion on May 25, 2000. The parties then reached a settlement concerning damages owed to Jarrard and Fitzsimmons. The January 12, 2000 order and the May 25, 2000 order were both incorporated into a final judgment entered by the district court on October 19, 2000. It is this judgment from which Plaintiffs now appeal.

## DISCUSSION

This Court reviews findings of fact following an ERISA bench trial for clear error. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 938 (6th Cir. 1997). The district court's legal conclusions are reviewed *de novo. Id.*

### I.

The issue on appeal is the district court's entry of judgment against Plaintiffs with regard to their ERISA breach of fiduciary duty claim.

Pursuant to § 1002(21)(A) of ERISA:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."

29 U.S.C. § 1002(21)(A). ERISA also provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). As pointed out by this Court in *Krohn,* "ERISA imposes high standards of fiduciary duty upon administrators of an ERISA plan." 173 F.3d at 547. ERISA's fiduciary duty involves three components: (1) a duty of loyalty, requiring that "all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries;'" (2) a "prudent person fiduciary obligation," requiring that a plan fiduciary exercise his or her duties "with the care, skill, prudence, and diligence" of a prudent person acting under similar circumstances; and (3) a duty to act for the exclusive purpose of proving benefits to plan participants. *Id*. (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988)). ERISA therefore "imposes an unwavering duty on an ERISA trustee to make

decisions with single-minded devotion to a plan's participants and beneficiaries and, in so doing, to act as a prudent person would act in a similar situation." *Berlin*, 858 F.2d at 1162. ERISA's fiduciary standards are derived from the common law of trusts "'bearing in mind the special nature and purpose of employee benefit plans.'" *Varity*, 516 U.S. at 506 (quoting H.R. Conf. Rep. No. 93-1280, at 302).

A fiduciary breaches his duty by providing plan participants with materially misleading information, "regardless of whether the fiduciary's statements or omissions were made negligently or intentionally." *Krohn*, 173 F.3d at 547 (citing *Berlin*, 858 F.2d at 1163-64). "Misleading communications to plan participants 'regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for a breach of fiduciary duty.'" *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992) (quoting *Berlin,* 858 F.2d at 1163). "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision in pursuing disability benefits to which she may be entitled." *Krohn*, 173 F.3d at 547 (citing *In Re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3d Cir. 1995)).

To establish a claim for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their detriment. *See Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122, 126 (2d Cir.1997); *Unisys*, 57 F.3d at 1266; *McMunn v. Pirelli Tire, LLC,* 161 F. Supp. 2d 97, 120 (D. Conn. 2001). "Whether an affirmative misrepresentation was 'material' is a 'mixed question of law and fact . . . .' [A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about