*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0183p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

PIPEFITTERS LOCAL 636 INSURANCE FUND;
JOHN R. GREEN, CHARLES INMAN, JOHN
O'NEIL, GREG SIEVERT, E. THOMAS DEVLIN,
GERALD HOOVER, Trustees of Pipefitters
Local 636 Insurance Fund,
　　　　　　　　　　*Plaintiffs-Appellees*,

　　　　　　　*v.*

BLUE CROSS AND BLUE SHIELD OF
MICHIGAN,
　　　　　　　　　*Defendant-Appellant*.

No. 12-2265

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:04-cv-73400—Arthur J. Tarnow, District Judge.

Argued: June 18, 2013

Decided and Filed: July 18, 2013

Before: SILER, CLAY, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Phillip J. DeRosier, DICKINSON WRIGHT PLLC, Detroit, Michigan, for
Appellant. Ronald S. Lederman, SULLIVAN, WARD, ASHER & PATTON, P.C.,
Southfield, Michigan, for Appellees. **ON BRIEF:** Phillip J. DeRosier, Francis R. Ortiz,
DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellant. Ronald S. Lederman,
Gerard J. Andree, SULLIVAN, WARD, ASHER & PATTON, P.C., Southfield,
Michigan, for Appellees. Christopher L. Kerr, OFFICE OF THE MICHIGAN
ATTORNEY GENERAL, Lansing, Michigan, for Amicus Curiae.

1

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  Plaintiff Pipefitters Local 636 Insurance Fund (sometimes referred to as "the Fund") is a self-funded benefits plan, established under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Plaintiff contends that Defendant Blue Cross and Blue Shield of Michigan (sometimes referred to as "BCBSM") violated the fiduciary duties Defendant owes to Plaintiff under ERISA by discretionarily setting and billing Plaintiff for a cost transfer subsidy fee, known as the "other-than-group fee."  The district court granted summary judgment to Plaintiff. For the following reasons, we **AFFIRM**.

**BACKGROUND**[1]

Plaintiff Pipefitters Local 636 Insurance Fund is "a multi-employer trust fund established under and administered pursuant to the Taft-Hartley Act, section 302 of the Labor Management Relations Act, 29 U.S.C. § 186, and [ERISA]. BCBSM is a Michigan non-profit corporation established pursuant to the Nonprofit Health Care Corporation Reform Act ("NHCCRA"), Mich. Comp. Laws § 550.110, *et seq.*" *Pipefitters II*, 418 F. App'x at 431.  Defendant is unlike a traditional, for-profit insurance company.  As explained by the Michigan Supreme Court, Defendant is a "statutory, non-profit corporation which is regulated within the limits of special enabling legislation by the [Michigan State Insurance] Commissioner in order to protect the interests of subscribers . . . [and] promot[e] the public health and welfare in assisting persons to budget health care costs." *Blue Cross & Blue Shield of Mich. v. Demlow*, 270 N.W.2d 845, 849–850 (Mich. 1978).  To enable Defendant to carry out this public purpose, the

---

[1]This is the fourth time that this case has found its way before our Court. *See generally Pipefitters Local 636 v. Blue Cross & Blue Shield of Mich. (Pipefitters I)*, 213 F. App'x 473 (6th Cir. 2007), *Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich. (Pipefitters II)*, 418 F. App'x 430 (6th Cir. 2011)*, Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich. (Pipefitters III)*, 654 F.3d 618 (6th Cir. 2011).  As the facts have been laid out in our prior decisions and have not changed, we draw upon them here.

State of Michigan has wholly exempted Defendant from state and local taxes as well as the general laws governing for-profit insurance companies. *See* Mich. Comp. Laws § 550.1102(1). Additionally, Michigan has imposed some special obligations on Defendant. One such obligation, which is central to this litigation, authorizes the Michigan State Insurance Commissioner to require Defendant to pay a cost transfer equal to one percent of its "earned subscription income"[2] to the state (the "Medigap obligation"), which the state then uses to pay for costs beyond what Medicare covers—for example, copays and deductibles for senior citizens).

Prior to its current arrangement with Defendant, Plaintiff was an "insured group customer of BCBSM, purchasing insurance coverage by paying premiums." *Pipefitters I*, 213 F. App'x at 475.

> In June 2002, the Fund converted from an experience rated (i.e. insured) group customer of BCBSM to a self-funded plan, and entered into an Administrative Services Contract ("ASC") with BCBSM. The ASC describes the administrative services that BCBSM provides for the Fund's medical benefits plan, including but not limited to: automated claims processing, financial management and reporting, cost containment initiatives, provider utilization audits, services for participant inquiries and/or participant communications, maintenance of all necessary records, provider utilization audits, and participation in trustee meetings. The ASC expressly states that "BCBSM is not the Plan Administrator, Plan Sponsor, or a named fiduciary for purposes of ERISA and its obligations shall be limited to the processing and payment of Enrollees' claims as provided herein."

*Pipefitters II*, 418 F. App'x at 431 (alterations omitted).

> Under the terms of the ASC, the Fund agreed to pay claims and administrative charges, including amounts billed during the year, hospital prepayments, actual administrative charges and group conversion fee, any late payment charges, statutory and/or contractual interest, and "any

---

[2] "Earned subscription income" is roughly equal to total revenue because earned subscription income includes all Defendant's income from each of its revenue streams, including individual customers, group customers, and subscribers who have an administrative services contract with Defendant, like Plaintiff does. *See In re Blue Cross & Blue Shield of Michigan's Applications for Rate Increases for Other Than Group Complementary, Nongroup, & Group Conversion Coverages*, No. 91-11806-BC (Mich. Ins. Comm'r Dec. 22, 1992) (slip op. at pp. 24–25), *available at* (R. 97-4, at PID# 1928–29.)

other amounts which are the Fund's responsibility pursuant to this Contract." The ASC also states that "the Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to Michigan law will be reflected in the hospital claims cost contained in Amounts Billed."

From June 2002 to January 2004, BCBSM collected from the Fund [a cost transfer subsidy fee—"the OTG fee,"] to subsidize coverage for non-group clients. The OTG [fee] was regularly collected from BCBSM's group clients. Self-insured clients, however, were not always required to pay the fee . . . . In January 2004, BCBSM unilaterally [stopped charging the Fund the OTG fee].

*Pipefitters I*, 213 F. App'x at 474–75 (internal citations and footnotes omitted).

In September 2004, the Fund sued BCBSM, alleging that BCBSM breached its fiduciary duty under ERISA by imposing and failing to disclose the OTG [fee] from June 2002 to January 2004. Specifically, the Fund claimed that the OTG [fee] violated Mich. Comp. Laws § 550.1211(2), which precludes some cost transfers between self-funded subscribers and BCBSM.

BCBSM moved for dismissal under Federal Rule of Civil Procedure 12(b)(6), asserting that it was not acting as an ERISA fiduciary when it assessed the OTG fee. The district court dismissed the claim and the Fund appealed. On appeal, we decided that the Fund had sufficiently stated a claim for a breach of fiduciary duty under ERISA and reversed and remanded for further proceedings.

*Pipefitters III*, 654 F.3d at 622–23.

On remand from *Pipefitters I*, Plaintiff moved for class certification, and both parties moved for summary judgment. The district court, in an oral ruling, did three things: (1) granted class certification; (2) granted Plaintiff summary judgment on its OTG imposition claim; and (3) granted Plaintiff summary judgment on its OTG disclosure claim as well as issued an injunction on that claim. We reversed the district court's summary judgment decision as to the disclosure claim, concluding that *Pipefitters I* had previously dismissed that claim. *Pipefitters II*, 418 F. App'x at 435. Additionally, we reversed the district court's class-certification decision. *Pipefitters III*,

654 F.3d at 630–33.  The decisions in *Pipefitters II* and *III* did not, however, disturb the district court's grant of summary judgment to Plaintiff on its OTG imposition claim. *Pipefitters II*, 418 F. App'x at 432 n.2.  On remand from the interlocutory appeals, the district court reaffirmed its grant of summary judgment to Plaintiff on the OTG imposition claim and awarded damages to Plaintiff in the amount of $284,970.84 plus $106,960.78 in prejudgment interest.

## STANDARD OF REVIEW

We review a district court's summary judgment decision *de novo*, applying the same standards as the district court.  *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law."  *Id.* (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a).  We may affirm a grant of summary judgment "on any basis supported by the record."  *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 429 (6th Cir. 2006).

## DISCUSSION

Plaintiff claims that Defendant's collection of the OTG fee in order to cover its Medigap obligation to the State of Michigan constituted a breach of Defendant's fiduciary duty to Plaintiff under 29 U.S.C. §§ 1104(a), 1106(b)(1).  To determine if the district court was correct to hold that Defendant breached its duties under ERISA, we must engage in two inquiries: first, whether Defendant was an ERISA fiduciary, and second, whether Defendant's action amounted to a breach.

**1.    Defendant's Fiduciary Status**

Under ERISA, "an entity that exercises *any* authority or control over disposition of a plan's assets becomes a fiduciary."  *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 798 (6th Cir. 2012) (citing *Briscoe v. Fine*, 444 F.3d 478, 490–91 (6th Cir. 2006)) (emphasis in *Guyan*); 29 U.S.C. § 1002(21)(A)(i) (An entity is an ERISA

fiduciary if it "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."). Though ERISA fiduciary status is broadly triggered with any control over plan assets, the inquiry in each case is granular, "ask[ing] whether [an entity] is a fiduciary with respect to the particular activity in question." *Briscoe*, 444 F.3d at 486.

There are two relationships that are necessary to understand the "particular activity in question" in this case. Because of Defendant's non-traditional status, we turn first to the relationship between it and the State of Michigan. As noted above, Michigan requires Defendant to pay a portion of its revenues to Michigan in order to subsidize the cost of health care to senior citizens. *See* Mich. Comp. Laws § 550.1609(5). Since 1996, Michigan, through its Insurance Commissioner, has set the Medigap obligation at the statutory-maximum rate of one percent. Therefore, every year since 1996, Defendant has been required by the Insurance Commissioner to submit one percent of its earned subscription income to Michigan in satisfaction of its Medigap obligation. While the Insurance Commissioner has made clear that income from administrative services customers, like Plaintiff, is to be included in Defendant's "earned subscription income," the Commissioner does not prescribe the method by which Defendant fulfills its one-percent Medigap obligation to the state. *See In re BCBSM's Application for OTG Rate Increases* (slip op. at pp. 24–25).

Turning to Defendant's relationship with Plaintiff, Defendant chose to collect the funds necessary to cover its Medigap obligation to the state by assessing the OTG fee to its customers, including Plaintiff. How this worked in practice was that Defendant negotiated discounts with healthcare providers such that if, for example, a provider would normally bill an individual $120 for a given procedure, it would only bill Defendant's customers $100. Defendant collected the OTG fee by not passing through the entire discount it had negotiated ($20) to its administrative services customers. Instead, Defendant would bill administrative services customers, like Plaintiff, $101 for

the procedure that it had only paid $100 for. The extra dollar would then be used by Defendant to pay its Medigap obligation to the State of Michigan.

Defendant contends that in doing so it merely acted as a "pass-through" and not as a fiduciary, and therefore under our decision in *Seaway Food Town, Inc. v. Medical Mutual of Ohio*, 347 F.3d 610 (6th Cir. 2003), it does not qualify as an ERISA fiduciary. However, the record reveals that Defendant did not charge all of its administrative services customers the OTG fee. In particular, in January 2004, Defendant stopped assessing the OTG fee to Plaintiff for business reasons.

In *Seaway*, we dealt with a dispute between an ERISA plan and an administrator over a contract provision that stated that "provider discounts" negotiated by the administrator were "for the sole benefit of [the administrator] and [the administrator] will retain any payments resulting therefrom." *Id*. at 613–14. The plan claimed it was improper for the administrator to have not passed the negotiated discounts onto the plan. *See id.* at 617. We disagreed with the plan and held that "where parties enter into a contract term at arm's length and where the term confers on one party the unilateral right to retain funds as compensation for services rendered with respect to an ERISA plan, that party's adherence to the term does not give rise to ERISA fiduciary status unless the term authorizes the party to exercise discretion with respect to that right." *Id*. at 619. But this is an unremarkable conclusion given that the terms of the contract in *Seaway* expressly stated that the negotiated discounts were for the administrator's "sole benefit."

Unlike in *Seaway*, the ASC between Plaintiff and Defendant contains no such analogous language. The ASC merely provides that "any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to [Michigan law] will be reflected in the hospital claims cost contained in Amounts Billed" to Plaintiff. (R. 8-2, Pipefitters' Administrative Services Contract, at PID# 178.) Nowhere does the ASC set forth the dollar amount for the OTG fee or even a method by which the OTG fee is to be calculated. The opaque language that "any cost transfer

subsidies or surcharges . . . will be reflected" in no way cabins Defendant's discretion to charge or set the OTG fee vis-à-vis Plaintiff.

Defendant nonetheless argues that it had no discretion in charging the OTG fee because it was the Michigan Insurance Commissioner who fixed the rate at one percent. This argument confuses the relevant activity for ERISA purposes. To be sure, the amount that Defendant owed to the State of Michigan to fulfill its Medigap obligation was fixed yearly at one percent of all of Defendant's earned subscription income, which includes income earned from individual customers, group customers, and administrative services customers, like Plaintiff. However, the state did not fix the rate that Defendant charged each customer, and crucially, neither did the ASC between Plaintiff and Defendant. Further, the fact that not all administrative services customers paid the OTG fee, including Plaintiff after January 2004, demonstrates that Defendant necessarily had discretion in the way it collected the funds to defray its one-percent Medigap obligation to the State of Michigan.

Because "an entity that exercises *any* authority or control over disposition of a plan's assets becomes a fiduciary," *Guyan,* 689 F.3d at 798, the district court was correct to conclude that Defendant was an ERISA fiduciary with respect to Defendant's collection of the OTG fee from Plaintiff.

**2.      Defendant's Breach of ERISA's Fiduciary Duties and Prohibition Against Self-Dealing**

Having concluded that Defendant was an ERISA fiduciary when it assessed the OTG fee to Plaintiff, we must consider whether the assessment of the OTG fee was a breach of the fiduciary duties it owed Plaintiff under ERISA. ERISA imposes three broad duties on qualified fiduciaries: (1) the duty of loyalty, which requires "all decisions regarding an ERISA plan . . . be made with an eye single to the interests of the participants and beneficiaries"; (2) the "prudent person fiduciary obligation," which requires a plan fiduciary to act with the "care, skill, prudence, and diligence of a prudent person acting under similar circumstances," and (3) the exclusive benefit rule, which

requires a fiduciary to "act for the exclusive purpose of providing benefits to plan participants." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448–49 (6th Cir. 2002) (internal quotation marks omitted); *accord Dudenhoefer v. Fifth Third Bancorp*, 692 F.3d 410, 417 (6th Cir. 2012); *see* 29 U.S.C. § 1104(a)(1). Each of these duties serves the goal of ensuring that ERISA fiduciaries act "solely in the interest of [plan] participants and beneficiaries." 29 U.S.C. § 1104(a)(1); *see also James*, 305 F.3d at 449.

In addition to these duties, ERISA also contains an "absolute bar against self dealing" set forth in 29 U.S.C. § 1106(b)(1). *See Brock v. Hendershott*, 840 F.2d 339, 341 (6th Cir. 1988). Section 1106(b)(1) provides that "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account . . . ." By discretionarily setting the OTG fee and using those funds to fulfill its Medigap obligation to the State of Michigan, Defendant ran afoul of both ERISA's fiduciary duties under § 1104(a) and its prohibition against self-dealing under § 1106(b)(1).

The situation in this case strikes us as similar to the one faced by the Ninth Circuit in *Patelco Credit Union v. Sahni*, 262 F.3d 897 (9th Cir. 2001). In *Patelco*, an ERISA plan administrator "marked up" the insurance premiums he charged to the plan with an administrative fee. *Id.* at 911. The contract between the plan and the administrator did not, however, provide what the administrative fee was to be and therefore, the administrator set the fee according to what he thought was "reasonable compensation" for his services as administrator. *Id.* The Ninth Circuit found this activity to be violative of § 1106(b)(1)'s prohibition against self-dealing. *Id.*

Similarly, in this case, Defendant unilaterally determined whether to collect the OTG fee and determined the rate at which it would collect the fee from Plaintiff despite the fact that the ASC did not authorize the exercise of such discretion. Defendant then used the discretionarily collected OTG fees "for [its] own account"—specifically, to satisfy its independent Medigap obligation to the State of Michigan. *See* 29 U.S.C. § 1106(b)(1). This is exactly the sort of self-dealing that ERISA prohibits fiduciaries

from engaging in. That the defendant in *Patelco* used the fee to pay himself and Defendant here used the fee to pay the state makes no difference. In each case, the fiduciary provided for its interests at the expense of the plan.

Recently, in *Guyan International, Inc. v. Professional Benefits Administrators, Inc.*, we held that a "classic case of self-dealing," like *Patelco*, violated not only § 1106(b)(1) but also constituted a breach of fiduciary duty under § 1104(a). In *Guyan*, the plaintiffs were each administrative-services customers of PBA. Under the terms of the contracts, PBA was required "to establish a segregated bank account for each [p]lan into which it would deposit the funds that it received from the corresponding [p]laintiff for paying the medical claims and (2) authorized PBA to pay medical claims by writing checks from this account." *Guyan*, 689 F.3d at 796. This arrangement contemplated that PBA would neither commingle the plaintiffs' funds nor use the funds for its own purposes, but PBA did just that. *Id*. at 796–97. PBA placed all of the funds into a "main, commingled account" and paid plaintiffs' participants' claims and its own expenses out of that account. *Id*. at 797. Under those facts, we "easily conclude[d]" that PBA "breached its fiduciary duty" and "blatantly violated [§§ 1104(a) and 1106(b)(1)] by using [p]lan assets—money from the employers and the covered employees—for its own purposes." *Id*. at 798–99.

Where a fiduciary uses a plan's funds for its own purposes, as is the case here with Defendant using the OTG fees it discretionarily charged to satisfy the Medigap obligation it owed to the State of Michigan, such a fiduciary is liable under § 1104(a)(1) and § 1106(b)(1). *Id*.; *accord Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 77 (2d Cir. 2011). Though ERISA's duties of loyalty and care are undeniably broader than the prohibition against self-dealing, acting with the "care, skill, prudence, and diligence" "with an eye single to the interests of the participants and beneficiaries," *James*, 305 F.3d at 448 (internal quotation marks omitted), necessarily requires that an ERISA fiduciary not use plan assets for its own purposes.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Plaintiff.